IN RE MILLER'S ESTATE. MILLER, RESPONDENT, *v.* BUSH, APPELLANT.

(No. 2,552.)

(Submitted October 12, 1908. Decided November 5, 1908.)

[97 Pac. 935.]

*Wills—Testamentary Capacity—Signature of Testatrix—Publication—Attesting Witnesses—Signing at Request of Testatrix.*

Wills—Testamentary Capacity—Evidence.
1. Evidence examined and held to show that testatrix had testamentary capacity, and was not under duress or undue influence at the time she made her will.

Same—Signature of Testatrix—Hand Guided by Another—Statutory Requirements.
2. A testatrix, who, being too weak to sign her will without assistance, requested a bystander to assist her in doing so, and who, knowing that the instrument she was about to sign was her will, held the pen and attached her signature with her hand thus guided, subscribed the will as required by subdivision 1 of section 4726, Revised Codes.

Same—Publication—What may Constitute.
3. In making a will it is not essential that the testator should expressly declare the instrument to be his will, but if, in consideration of all the attending facts and circumstances, a substantial compliance with subdivision 3 of section 4726, Revised Codes, providing that the testator must, at the time of subscribing or acknowledging it, declare to the attesting witnesses that the instrument is his will, is shown, it is sufficient.

Same—Publication—Evidence—Sufficiency.
4. The attestation clause to a will recited that the instrument was signed by testatrix and published and declared to be her last will and testament in the presence of the two subscribing witnesses, who, at her request and in her presence, and in the presence of each other, attached their signatures to it. At the hearing of a contest to the probate of the will one of the attesting witnesses testified that testatrix declared the instrument to be her will. This witness was corroborated. The other witness stated that he did not hear her say anything about making her will. *Held,* that publication of the will was established as required by subdivision 3 of section 4726, Revised Codes.

Same—Execution—Signing by Witnesses—Request by Testatrix—Substantial Compliance with Statute.
5. *Held,* that subdivision 4 of section 4726, Revised Codes, providing that there must be two attesting witnesses to a will, each of whom must sign the instrument *at the testator's request,* and in his presence, was substantially followed when the legal adviser of testatrix requested, with her intelligent acquiescence, the witnesses to sign her will.

*Appeal from District Court, Silver Bow County; Geo. M. Bourquin, Judge.*

Proceedings, by Mary Bush, for the probate of the will of Mary Miller, deceased. Ella Miller appeared as contestant and offered for probate a prior will. From a judgment denying probate, petitioner, Mary Bush, appeals. Reversed and remanded.

*Mr. N. A. Rotering,* and *Mr. S. T. Hogevoll,* for Appellant.

The same degree of mental capacity is not required to make out a will as is required in making out an ordinary contract. (*Potts* v. *House,* 6 Ga. 324, 50 Am. Dec. 329; *Harrison* v. *Rowan,* 3 Wash. C. C. 580, Fed. Cas. No. 6141; *Kinne* v. *Kinne,* 9 Conn. 102, 21 Am. Dec. 732; *Converse* v. *Converse,* 21 Vt. 168, 52 Am. Dec. 58; *Thompson* v. *Kyner,* 65 Pa. 368.)

If an attorney is hired by the testator to make out a will, his acts in regard to requiring witnesses to sign is the act of the testator. (Page on Wills, par. 227; Schouler on Wills, 326; *Ames* v. *Ames,* 40 Or. 495, 67 Pac. 737; *Skinner* v. *Lewis,* 40 Or. 571, 67 Pac. 951.)   When the hand of the testator is guided by some one, the act of signing is that of the testator. (*Cozzen's Will,* 61 Pa. 196, 201; *McMechan* v. *McMechan,* 17 W. Va. 683, 41 Am. Rep. 682; *Sheehan* v. *Kearney,* 82 Miss. 688, 21 South. 41, 35 L. R. A. 102; *Higgins* v. *Carleton,* 28 Md. 115, 92 Am. Dec. 666; *Vines* v. *Clingfost,* 21 Ark. 309; *Wilson* v. *Beddard,* 12 Sim. 28.)

The publishing and declaring of wills may be made by answering questions put to scriveners or others, or in any way by signs or gestures or circumstances communicating to the witnesses that testator understands it. (1 Woerner's American Law of Administration, p. 72; *Denny* v. *Pinney,* 60 Vt. 524, 12 Atl. 108; *Tunison* v. *Tunison,* 4 Bradf. 138, 144; *McKinley* v. *Lamb,* 64 Barb. 199, 303; *In re Hunt,* 110 N. Y. 278, 18 N. E. 106; *Compton* v. *Mitton,* 12 N. J. L. 70, 73; *Ludlow* v. *Ludlow,* 36 N. J. Eq. 597.)   Any indication by the testator to the witnesses of his knowledge that the instrument to be attested by them is meant for his last will is sufficient. (*Smith* v. *Dolby,*

4 Harr. (Del.), 350, 351; *Cilley* v. *Cilley*, 34 Me. 162; *Grimm* v. *Tittman*, 113 Mo. 58, 20 S. W. 664; *Ayres* v. *Ayres*, 43 N. J. Eq. 565, 12 Atl. 621; *Swett* v. *Boardman*, 1 Mass. 258, 2 Am. Dec. 16.)

Validity of the will does not depend upon the good memory of a witness. (*Rogers* v. *Diamond*, 13 Ark. 374; *Jackson* v. *Vickory*, 1 Wend. 412, 19 Am. Dec. 522; *Dewey* v. *Dewey*, 1 Metc. 349, 35 Am. Dec. 367; *Jauncey* v. *Thorne*, 2 Barb. Ch. 41.)

*Mr. Henry N. Blake,* and *Mr. J. M. Lewis,* for Respondent.

MR. JUSTICE SMITH delivered the opinion of the court.

The above-named appellant filed her petition in the district court of Silver Bow county, praying for the admission to probate of the will of Mary Miller, deceased. It is recited in said petition that the probable value of the estate is at least $25,000. In and by the will offered for probate the testatrix gave to the appellant the sum of $250, and to the respondent, her daughter, she left all the rest and residue of her estate after the payment of her debts and funeral expenses. The appellant was named as executrix of said will. The respondent filed a contest to the petition of the appellant, and alleged in said contest, among other things, that the testatrix never signed the will offered, and never asked or requested any person or persons to sign her name to said instrument; that she never asked nor requested any person or persons to sign said will as witnesses, and especially that she never asked nor requested the witnesses who actually signed the will to sign the same as witnesses; that she never declared the instrument to be her last will and testament; that she was in such a weak mental condition at the time of making and signing the instrument that she did not know or realize what was being done; that the signing of her name to said will was done without her knowledge or consent, was a forgery, and not her signature; and, finally, that she was not in a mental condition to make a will and was under duress at the time and the undue

influence of the appellant. The respondent then offered for probate another will of the deceased, dated prior to the one offered by the appellant, and asked that the same be admitted to probate as the last will and testament of the deceased. In this latter will all of the property of the deceased was left to the respondent.

After hearing testimony, the court rendered its decision as follows: "In this proceeding heretofore tried by this court the court finds for this plaintiff, and concludes therefrom that the will offered for probate by defendant should be, and it hereby is, rejected. It is the further order of the court that this will offered for probate by plaintiff be admitted thereto. I am of the opinion the proof not only fails to show that the 'Bush' will was executed and attested as prescribed by statute, but preponderates to the contrary in these particulars, viz., it appears testatrix did not declare to both attesting witnesses that the instrument was her will, and it appears testatrix did not request the attesting witnesses to sign the instrument. The implications usually indulged, that, where testator and witnesses all sign the instrument in each other's presence, the foregoing requirements were satisfied, arise in cases where the testator is in possession of all faculties, and capable of clear observation and understanding. They cannot be indulged here, where the testatrix was on the verge of dissolution and in a semi-conscious state, with all her faculties dulled and dormant by the near approach of death. It is admitted the will offered by plaintiff is entitled to probate on rejection of this 'Bush' will," and afterward a judgment was entered in accordance with the opinion of the court. The appellant then made a motion for a new trial, which motion was overruled, and she now appeals to this court from the order denying the motion for a new trial, and also from the judgment.

Robert R. Diamond was sworn in support of the petition of appellant. He testified: "I was in Mrs. Miller's room at the time her will was witnessed. Mr. Rotering asked me to sign this will as a witness. Mrs. Miller asked Mr. Rotering to take

the witnesses to the will. I heard her, and I saw Mrs. Miller sign it. She said she knew what it was. It was read to her. I heard her talk. She could talk. I was in her room when she signed it, and Townshend was the other witness, and at the time he was in the room. Mr. Rotering, I believe, asked him to sign as a witness. At the time Mrs. Miller was on a pillow. She was in a half sitting position. I do not know—I could not tell whether she appeared to be very sick at that time. She could talk loud enough to be heard, and it was three or four hours after that that she died, I should judge; and I was there when she died. I was not there when the will was written. The will was written when I came in. I was in there, and Mr. Rotering came in and read the will to her. She signed that will about the 18th of July, at about half-past 9 or 10 o'clock. The pen was in her hand when she signed. As to whether she wrote her name—she held the pen. She tried to write her own name, and she asked Mrs. Bush to guide her hand. She said to Mrs. Bush, 'Sign for me'; and Mrs. Bush guided her hand, and she wrote with Mrs. Bush guiding her hand. I am sure of that, absolutely. The name here is the one where Mrs. Bush guided her hand for. She tried to write her name herself. She don't write that way when she was writing. Mrs. Bush did not write her name. She held her hand. Mrs. Bush guided Mrs. Miller's hand. That is not her writing. I have seen Mrs. Miller's writing. I have seen her name signed to papers. She writes a more straight hand than that. Mrs. Miller said, while Dr. Townshend was there, that she knew it was her will when it was read to her. It was read to her in the presence of Dr. Townshend and of all who were there. When it was read to her, she said it was her will. Her voice was not very weak at that time. You could understand her. I live with Mrs. Bush. Mrs. Miller did not ask me to sign this as a witness, and she did not tell me it was her last will, and I did hear her say it was her will, though, when it was read to her. When her name was signed, there she had to be held up in bed. Mrs. Bush held her up. Mrs. Miller did not talk only when she was asked something.

The will was held before Mrs. Miller so she could sign it, and it was resting on a book, I believe. I did not tell Mrs. Miller that I was signing it as a witness. She saw me. I believe she heard Mr. Rotering ask me to sign it. Dr. Townshend signed it first. Mr. Rotering took the paper out of Dr. Townshend's hand, and asked me to sign it. It is not a fact that, as Dr. Townshend and Dr. McCarthy came in the door, Mrs. Miller was being held up in the bed, and they were trying to get her name signed to it at that moment."

Harland H. Townshend testified: "I am a physician and surgeon. I was one of the physicians that attended Mary Miller, deceased, during her last illness. I did not see the will made. I was present when the will was signed, and I walked in as she had the pen in her hand. She was at that time, I think, perfectly rational, so far as her mind was concerned. I signed my name as one of the subscribing witnesses. I signed it at the request of Nicholas Rotering, in the presence of Mary Miller and R. S. Diamond, the other subscribing witness. Mary Miller died at the hour of 12:25 A. M. the next day. She made her will approximately about 9:30 P. M. on July 18, 1907. I did not know her condition prior to the 18th. She died of intestinal obstruction, but the direct cause would be heart failure from pressure of gas that collected in the bowels. She was not in misery from said trouble. I first called to see her about 2 o'clock and remained there thirty or thirty-five minutes. I then gave her hypodermically a heart stimulant, which was a grain of strychnine and no other medicine. I probably gave her two more injections during the evening. At the first visit her condition was serious, but I did not consider her in immediate danger at that time. My next visit was just before 6 o'clock. I then stayed about twenty minutes. At that time she was considerably weaker, and her bowels more distended. She did not suffer extremely, was breathing short, but not much pain. The depression was quite marked then. I considered her dangerously sick at that time. She did not talk a great deal. I did not think she could get well, but she was not in a dying condi-

tion then, but she might die in a few hours. I saw her again about 7 o'clock. Her condition was a great deal worse. Her heart action was irregular. She did not talk very much. Dr. McCarthy and I went down about 9 o'clock. At that time her condition was beyond help, in a dying condition. I was there fifteen or twenty minutes. I did not talk much with her. She would answer questions. The questions were none except about her condition. She was asked if we should not telegraph for her daughter, and she said no. Mrs. Bush gave me her daughter's address. Mrs. Miller's voice was weak. At that time Mr. Rotering, Mrs. Bush, Dr. McCarthy, and two or three others were present. I did not hear Mrs. Miller say anything about making a will. She did not tell me she had made a will. She did not ask me to sign as a witness. She did not write her name. Someone else was helping her to sign her name. I do not remember who it was. She held a pen. I did not see the name written by anybody. I was looking directly on the paper; no. As I entered the room, the name of Mary Miller was signed to the will. I do not know who signed it. She had the pen in her hand. I know this because I was able to see that she was signing a document while she was being supported by one or two persons, and some one was standing by her side, steadying her hand, and her hand was in contact with the paper and in the act of writing. She was marking the paper with a pen. She did not say anything about it to me, and I do not remember if she said anything to anybody about it. She was in a dying condition. I was requested by Mr. Rotering, or possibly others, to sign the will. I do not remember if I saw Mr. Diamond sign his name on the will, and I do not remember if anybody requested him to sign as a witness, and I do not remember what Mr. Rotering said to me, and I did not see the will written. Dr. McCarthy was with me all the time I was there. I think she was conscious, and in my judgment she was conscious enough to know what was taking place there in the way of making a will. I think so because they are generally conscious up to the last minute. I base my judgment on this and on my own

judgment, and from the fact that she answered questions perfectly; but I do not remember the questions asked her at that time, if they related to her condition and how she felt, and I do not know if there were no questions of business asked her at that time. I think Mrs. Miller, at the time she signed the instrument as her will and at the time I signed as a witness, was fully competent to execute papers of such importance as deeds or wills or to transact important business. She was perfectly conscious. Of course, any person who is sick is not in condition for business, but may have understood perfectly that transaction. In my opinion she was rational, and knew what she was doing.''

Thomas F. Bush testified: ''I am a son of Mrs. Bush. I was present when this will was made, and I had a conversation with the deceased in regard to getting a lawyer for her. She asked me if I would go up and get Mr. Rotering for her, and I went and got him, and he drew up the will for her. I heard Mr. Rotering telling the witnesses here to sign their names to the will. He asked Dr. Townshend if he would sign the will. I remember that. I heard Mr. Rotering ask Mr. Diamond to sign the will. I did not hear any conversation between Mr. Rotering and Mrs. Miller.''

N. A. Rotering, an attorney at law, testified: ''The instrument you hand me is the will I drew up for Mrs. Miller on the eighteenth day of July, 1907. I made out the will at the request of Mrs. Miller, and the signatures in the will are genuine. I requested the witnesses to sign for Mrs. Miller. I was instructed by Mrs. Miller to draw up the will as I drew it up, and I drew it up according to her wishes. I did not see Mrs. Miller when I drew up the will. I had seen her in the morning. She asked me to look up some property for her on Copper or Quartz street that was in litigation, and also as to whether or not she had a damage case for being run over by a horse and buggy. That was in the morning when I saw her, and she stated at that time that later on she would send for me to draw up a will for her. She said that Mrs. Bush was to receive $250,

stating that it was for taking care of her after she had been run over. · She told me that in the morning, and, when I asked her who was to be the executor, she said Mrs. Bush was to handle the property, and she said that Miss Miller had all she could do to attend to the mine that was in litigation in Mexico. She said that she would send for me later on to draw up the will. I drew the will up at the house. I had a talk with her at the bedside. I told her I was there with the will, and I then read it over to her and she said that was all right, and then it was signed. I asked her whether or not she wished to sign it, and we gave her a pen, and she was weak and she could not sign it, and then she motioned for some one to assist her in writing her name, she holding the pen in her hand, and she said that that was her will; and I asked her whether or not it was to be witnessed, and she said, 'Yes,' and then I requested Dr. Townshend and Mr. Diamond to sign as witnesses. She talked in a low voice, but it was loud enough to hear. I understood her, and there were some standing as close to her as I was. When the signature was attached, she said that was her will. I did not see Dr. McCarthy there then. I stepped out of the room after the will was signed. I said to the witnesses that that was the will, and I asked Dr. Townshend if he would sign as a subscribing witness, and he said 'Yes.' That happened immediately after Mrs. Miller signed the will, at the bedside. Physically, Mrs. Miller was weak, but she knew what business she transacted. She was conscious and understood what was said. The pen was in Mrs. Miller's hand when the name 'Mary Miller' was signed on that will, and Mrs. Miller's hand was guided by Mrs. Bush. If I remember correctly, I handed the pen to Mrs. Miller. She took it from me, and held it in her hand, but, when she undertook to write, her hand was weak. Mrs. Miller made those marks.''

· Dr. P. H. McCarthy testified for contestant: ''I went into Mrs. Miller's room with Dr. Townshend. When we went in there, we found a lady perhaps forty-five or fifty years old; and she showed that she had been sick for quite a while, and found

the pulse about perhaps one hundred and forty or one hundred and fifty, and her heart was beating very feebly. We found her badly distended. In fact, the abdomen was distended about three times the normal size. We decided that she was too low for any surgical operation, as she was in a dying condition then, and she died about an hour afterward. I do not think she was able to talk at that time. I talked to her—that is, I hollered in her ear—and asked her if she wanted to send for her daughter as she was not going to live very long, and she shook her head. I did not hear her speak while I was there, and I do not think she was in condition that she could speak. I could not hear any sound. As to whether she was in condition so that she could understand what was going on there, as for that, she might have been able to understand, but she showed us in no way that she was, although she might have been. They often retain their mental faculties right up to death. I do not think she could understand clearly. I do not think she could understand clearly enough to be able to transact much business at that time. I saw her name signed to the will. If I remember, there was a pen put in Mrs. Miller's hand, in the fingers like that, and the fingers held there, and a lady took hold of the hand and just wrote the name. She just did that. I did not hear her say anything when the pen was put in her hand. I think they told her what it was, but, if she made any nod to indicate what was being done, I did not see it. She was lying in the bed when I first went in the room, and she was still lying in bed when this woman took her hand and made the writing. I do not think she was able to raise her hand to take the pen. She might have, but not very much. I do not remember whether her name was signed before Dr. Townshend and Mr. Diamond signed as witnesses. I just saw Dr. Townshend sign the will. I saw Mrs. Miller when they signed her name, and then I saw Dr. Townshend. I did not see Mr. Diamond sign. I stepped on Dr. Townshend's toe when he was signing the will. I did not want him to sign the will because I did not honestly think she was capable of making a will, and perhaps I thought maybe

her daughter should be the one to have the will; that might have had something to do with it. In my opinion I don't think she was capable of transacting such a business at the time that we saw her. I have had considerable observation of people just before death, and I considered her dying at the time I went there. I did not hear her talk. She might have been able to, but I did not hear. She nodded to me. I think Dr. Townshend asked her some questions, but I don't remember what he asked her. She might have been able to whisper; but, if she was, it was very low. I think if she talked that night you would have to get pretty close to the lips to understand her, and in talking to her you would have to get close to her to have her understand. Their senses are becoming dull, and it takes quite a shout to arouse them in that condition. During most of the time that I was in there I should judge I was within three or three and a half feet of the bed, right where I could see what was going on. She looked around and the pupils of her eyes were slightly contracted. She looked kind of dazed. She looked intelligent. I do not think she was perfectly conscious of the idea of sending for her daughter. I do not think she understood sufficiently what I meant. I decided that her faculties were pretty well impaired, and that I would not pay much attention to what she did or said. I afterward told Dr. Townshend that he should not have signed the will, that he was foolish to sign the will. I did not think it was my business to object to somebody else signing the will, but I thought I would not like to have Townshend sign it. At that time, perhaps, she had some of her faculties, but I thought they were impaired. She might have been able to transact some business for all I know, but I don't think she was able to transact enormous business of any kind. I will let it go at that. I cannot say that she was not able to transact any business. My opinion is that she could not transact business very well.''

A witness by the name of Peck testified that he was present when the will was signed; that he asked Mrs. Miller how she was, and she said she was pretty sick; that he could hear her,

and did not have to stoop close down to get her to understand; that she said something about a will while he was in the room; that Mr. Rotering was writing at the table before the doctors came in, and, after their arrival, Mr. Rotering told Mrs. Miller the will was ready; that Mrs. Miller asked Mrs. Bush to sign; that Mr. Rotering did not read the will over to Mrs. Miller while witness was there; and that witness did not hear it read.

The contestant testified that the property originally belonged to her, and that she transferred it to her mother when she went to Mexico.    Other witnesses, however, gave testimony that would seem to indicate that the deceased treated the property as her own and referred to it as "my property"; and one witness testified: "She [deceased] also said that through work and saving *they* had accumulated sufficient to last the both of them. Her money was hard earned, honestly got, and every dollar that she had in the world went to her daughter."

Mrs. Provencial testified that she knew Mrs. Miller for about a year and a half before her death and heard her speak of Mrs. Bush's kindness to her the morning before she died; that witness was present when she died, and also when the will was made; that she asked for food several hours after the will was made; that deceased told her that, if she died, she "did not want her daughter to look at her dead face"; that witness was present when Mr. Rotering came in with the papers; that she was there all the time Mr. Rotering was there, and she did not see him write out the will, although she was in the room; that she was busy with Mrs. Miller; that, if a question were asked of Mrs. Miller, she would answer it; that she answered the questions of the doctors; that Dr. Townshend wanted to send for her daughter; that she said the paper was her will in the presence of Dr. Townshend and Dr. McCarthy; that witness did not hear her ask Dr. Townshend and Mr. Diamond to sign as witnesses; that after the will was read to deceased she said it was her will; that this was before the doctors came in; and that nothing was said about the will by anybody while the doctors were there.

The contestee testified that the deceased spoke to her several times between 6 and 11 o'clock of the night she died; that she spoke after the doctors were there; that she only answered questions during the time the doctors were there; that Dr. McCarthy asked her how she felt, and if he should send for her daughter, and she said, "No." Witness then continued: "I helped Mrs. Miller to write her name on the will. She asked me to. Somebody was holding it on a book, but I don't remember who. I did not have hold of it at all. I simply stood beside her and put my arm around her, and took hold of her hand from that side, and I made the movement of the hand to make the letters, and made the letters just as I make letters. The last part of it she made herself. The first part I helped her make. That is the way I make an 'M.' She does not make them that way; she makes them upward, and this is commenced at the top, as I make them. She wrote the most of that. I kind of guided her hand. I guided her hand all the way through. She asked me to, after the doctors came in. She asked me to sign that for her, but I don't know whether the doctors were in the room. She looked up, and said: 'You sign that paper.' I was in the act of signing the will as the doctors came in, but I did not have it finished when they came. I don't remember of hearing her say anything about Dr. Townshend signing this will as a witness. I don't know whether she told Dr. Townshend that this was her will. She said that this was her will, but I don't remember whether the doctor was in there or not. She said it was her will around the time she signed it. She said it to Mr. Rotering, her attorney. I did not see the will written. I was in the room where Mrs. Miller was all evening. I don't think the will was written there in the room. I did not see Mr. Rotering writing the will there by the side of the bed. I did not hear her request anybody to sign the will, but I heard her say it was her will."

Several witnesses testified that Mrs. Miller had a great affection for her daughter. A nonexpert witness testified that in the month of June, 1907, Mrs. Miller "was very weak-minded

and very forgetful''; and another testified that ''he did not consider her in a condition to transact any business or to be held responsible for anything she did; that she was feeble-minded, and that her actions showed that there was something wrong with her.'' On the other hand, other witnesses testified that they saw Mrs. Miller about a week prior to her death, and that she was perfectly sane; that she was ''mentioning leases and wills and one thing and another, and would make a will in favor of Mrs. Bush, who was the best friend she had in the world.''

The foregoing is substantially all of the testimony bearing upon the physical and mental condition of the deceased.

It will be unnecessary to notice assignments of error based upon the court's rulings at the hearing against the appellant, because we are of opinion that the learned district judge erred in denying the appellant's petition for the probate of the so-called ''Bush'' will.

Section 4726, Revised Codes, reads as follows: ''Every will, other than a nuncupative will, must be in writing; and every will, other than a holographic will, and a nuncupative will, must be executed and attested as follows:

'' (1) It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto.

'' (2) The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them, to have been made by him or by his authority.

'' (3) The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; and,

'' (4) There must be two attesting witnesses, each of whom must sign his name as a witness, at the end of the will, at the testator's request, and in his presence.''

The first question presented is whether the deceased was competent to make a will. It appears that she had been injured in some way, and was suffering from an obstruction of the bowels. She died about three hours after the will was made. No tes-

timony was offered to the effect that she was afflicted with any impairment of her mental faculties other than what would result from the near approach of death, except that of the witnesses who swore that in June she was weak-minded and forgetful, and her actions "showed that there was something wrong with her." The court below appears to have attached not much importance to this evidence, as it was the opinion of the judge that her condition was due to the fact that she was "on the verge of dissolution and in a semi-conscious state, with all her faculties dulled and dormant by the near approach of death." But we do not think that this conclusion has any substantial testimony to support it. It appears from the testimony of Mr. Rotering, who is a member of the bar of this court in good standing, that on the morning of July 18th Mrs. Miller asked him to look up some property for her, and also to determine whether she had a cause of action for injuries she had received. She also said it was her purpose to execute a will, that she wanted to leave Mrs. Bush $250 as a reward for caring for her after her injury, and wanted Mrs. Bush to administer her estate, stating as a reason for not nominating her daughter that the latter had all she could do to attend to some mining litigation in Mexico. With the exception of the $250, all of the balance of the comparatively large estate was to go to the daughter. It seems to us that these ideas, expressed as they were to Mr. Rotering at a time when she had in mind the necessity of making a will, evinced not only a sound and disposing mind, but embodied the very highest sentiments of gratitude and maternal solicitude as well. Let us suppose that some one other than Miss Miller were trying to break this will. Would any one indulge the idea that the testatrix did not make the most natural and commendable disposition of her property? No court would think of finding that this will did not in fact express her wishes, or that she was under duress or undue influence, and the district court of Silver Bow county did not so find. The court was of opinion that she was so near death that her faculties were dulled and impaired. The only testimony to warrant such opinion is that of Dr. Mc-

Carthy. He testified that he did not think she could under-
stand clearly enough to transact business, such business, enor-
mous business. He would not say that she was unable to trans-
act any business. He did not want Dr. Townshend to sign the
will as a witness. Perhaps the thought that her daughter should
administer the estate had something to do with that. At any
rate, he made no protest against the witnesses signing the will,
although he knew it was a will, and was of opinion that she was
not capable of making a will. On the other hand, we have the
testimony of Dr. Townshend, the attending physician, and sev-
eral nonexpert witnesses as to her mental condition, and they
narrate facts and circumstances surrounding the transaction
that lead to the irresistible conclusion, in our judgment, that
she was of sane and disposing mind. The will was read over to
her. She said that she knew what it was and directed that it
should be executed.

Let us next inquire whether the statutory requirements were
observed. The district court found, in effect, that they were,
if she was of sound and disposing mind. We will take up sec-
tion 4726, *supra,* by paragraphs.

1. A will must be subscribed at the end thereof by the testa-
tor himself, or some person in his presence and by his direction
must subscribe his name thereto. If she was capable of mak-
ing a will, as we think she was, there can be no question that
the mandate of this paragraph was carried out. Knowing what
she was signing, she held the pen in her hand, and she and Mrs.
Bush together signed her name after she had requested Mrs.
Bush to assist her.

2. The subscription must be made in the presence of the at-
testing witnesses, or be acknowledged by the testator to them,
to have been made by him or by his authority. Diamond tes-
tified that he saw the testatrix sign the will, and Townshend
said: "I was present when the will was signed. I walked in as
she had the pen in her hand."

3. The testator must at the time of subscribing or acknowl-
edging the same declare to the attesting witnesses that the in-

strument is his will. Having found that the testatrix was of disposing mind, there is no difficulty, under the authorities, in going one step further, and determining that paragraph 3 was complied with. In the first place, we have before us the attestation clause of the will itself, wherein it is recited: "The foregoing instrument, consisting of two pages besides this, was at the date hereof by the said Mary Miller signed and published as and declared to be her last will and testament in presence of us, who, at her request and in her presence, and in the presence of each other, have signed our names as witnesses thereto" —signed by Townshend and Diamond. In 30 American and English Encyclopedia of Law, second edition, page 588, we find, in the text, this statement: "Publication may be established by the testimony of one attesting witness in opposition to the other, the presumption being in its favor; and the failure of the witnesses to remember whether publication was made or not will not defeat the will when the attestation clause recites the fact." (Cases cited to support the text: *Remsen* v. *Brinckerhoff*, 26 Wend. (N. Y.) 325, 37 Am. Dec. 251; *Orser* v. *Orser*, 24 N. Y. 51; *Trustees etc.* v. *Calhoun*, 25 N. Y. 422; *In re Will of Cottrell*, 95 N. Y. 329.)

In the case of *Trustees etc.* v. *Calhoun, supra,* the court, through Mr. Justice Gould, said: "Take, then, the whole transactions of the day, and consider them as a whole, and can there be any doubt that Mr. D. [the testator] intended that Starr [the person who drew the will] was to see that the will was duly executed, and that, whether or not he distinctly heard every word that Starr said to the other witness, he knew what was going on, and heard enough to keep himself fully aware of what Starr was doing and the substance of what he was saying. * * * The purpose of the statute is to make sure that the testator is aware that he is making a will, and that he be not imposed on and procured to sign a will when he supposes it to be some other instrument. * * * It is, of course, too late to claim that the facts making due execution must all, or any of them, be established by the concurring testimony of the two

subscribing witnesses. Both of those witnesses must be examined, but the will may be established, even in direct opposition to the testimony of both of them." This last proposition is referred to in an interesting note to the case, wherein is set forth the opinion of Judge Denio in *Tarrant* v. *Ware*. citing numerous authorities to the same point.

In the case at bar the witness Diamond testified that the deceased said in the presence of Townshend, the other attesting witness, that she knew it was her will. This witness is abundantly corroborated. Dr. Townshend testified that he did not hear her say anything about making a will, and that she did not ask him to sign as a witness. His memory, however, is at variance with the attestation clause of the will. It is not essential that the testator should expressly ask the subscribing witnesses to sign or expressly declare the instrument to be his will. All the attending facts and circumstances should be considered in order to determine whether the statute has been substantially complied with so as to carry out the intent with which it was adopted. Our conclusion in this manner is borne out by the following authorities: *Rogers* v. *Diamond,* 13 Ark. 474; *Ames* v. *Ames,* 40 Or. 495, 67 Pac. 737; *Deupree* v. *Deupree,* 45 Ga. 415; *Denny* v. *Pinney,* 60 Vt. 524, 12 Atl. 108; *Ludlow* v. *Ludlow,* 36 N. J. Eq. 597; *Grimm* v. *Tittman,* 113 Mo. 56, 20 S. W. 664; *Ayres* v. *Ayres,* 43 N. J. Eq. 565, 12 Atl. 621; 1 Woerner's American Law of Administration, sec. 40, p. 71; *In the Matter of Hunt's Will,* 110 N. Y. 278, 18 N. E. 106.

Mr. Schouler in his work on Wills, section 326, says this: "A declaration before the witnesses in express terms that the instrument is one's last will best satisfies the statute; but less than this is considered acceptable, provided that in some way the testator makes this fact known by acts or conduct, or, better still, by words. And, bearing in mind that the main object of such legislation is to repel fraud and establish a *bona fide* testament, we may assume that a substantial rather than a literal compliance with the statute formalities is sufficient." (See, also, 30 Am. & Eng. Ency. of Law, 2d ed., p. 589.) In the case we are

considering both witnesses actually knew that they were attesting the execution of a will, and Dr. McCarthy also knew it.

4.  There must be two attesting witnesses each of whom must sign his name as a witness, at the end of the will, at the testator's request and in his presence. "The request to the witnesses to sign may be by words or signs. No particular form of request is necessary, and it may be implied from acts. Anything which conveys to the witnesses the idea that they are desired to be witnesses is a good request. Even a knowing acquiescence may be equivalent to an actual request in words. Thus the testator need not make the request himself, but it may be made by the draftsman, professional adviser, or other person present, provided the testator's intelligent acquiescence distinctly appears." (30 Am. & Eng. Ency. of Law, p. 596, par. 11.)

We are of opinion that the statutory requirements were substantially complied with in the execution of the "Bush" will, and that it should have been admitted to probate.

The judgment of the district court of Silver Bow county and the order denying a new trial are reversed, and the cause is remanded with instructions to dismiss the contest and grant the prayer of the contestee for admission of the will of July 18, 1907, to probate.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.