[No. 2238]

## IN THE MATTER OF THE ESTATE OF WILLIAM J. GORDON, DECEASED.

[161 Pac. 717]

1. WILLS—SIGNATURE—STATUTE.

Under Stats. 1915, c. 35, providing that no will shall be valid unless it be in writing and signed by the testator or by some person in his presence and by his express direction, a signature to a will by having another aid or steady the hand of the testator, at his request, is valid, if the testator possessed testamentary capacity, was acting under no undue influence, and realized the force and effect of the provisions of the will he was signing.

2. WILLS — CONTEST — TESTAMENTARY CAPACITY — SUFFICIENCY OF EVIDENCE.

Evidence in a will contest, *held* to sustain a finding that, when the testator's aided signature was made, he did not know that the instrument he was signing contained provisions as to the distribution of his estate which he had formerly discussed with the draftsman, or ordered him to prepare.

3. APPEAL AND ERROR—FINDING—CONCLUSIVENESS.

Where there is a substantial conflict in the evidence on a material issue, the trial court's determination will not be disturbed, if it is supported by substantial evidence.

APPEAL from Second Judicial District Court, Washoe County; *Thomas F. Moran*, Judge.

Will contest by Mrs. William J. Gordon, and William J. Gordon, Jr., minor heir of William J. Gordon, deceased, against Mary T. Dougherty. Order refusing to admit the will to probate, and contestees appeal. **Order affirmed** (COLEMAN, J., dissenting).

*James T. Boyd* and *Roy W. Stoddard*, for Appellants:

The lower court erred both in refusing to admit the will to probate and in refusing proponent a new trial. In view of the circumstances of this cause, and in view of the clearness with which every fact attending the signing of the will was brought out, and the court's statement as to the facts, there should be a direction to the lower court to admit the will to probate without further proceedings on the part of the proponent.

Upon a mere entry on a chart by the nurse, who was

not even subpenaed in the case, the court found that testator was insane when he signed the will. Even where it is shown that a person was confined in an insane asylum, suffering from settled insanity, when he signed his will, if the will was signed during a lucid interval, the court will sustain it. (40 Cyc. 1013, 1016.)

Mere mental vagaries during an illness, or delirium for days prior to the execution of a will, will not defeat the instrument if it be shown that at the time of its execution the testator was in his right mind. (40 Cyc. 1011.)

The court found that the scrawl at the end of the will was made by testator. If it could not do for his signature, certainly it was sufficient under our law for his mark, and must stand as his signature. (Rev. Laws, 3913, 6204; *In Re Will of Bridget Gilfoyle*, 22 L. R. A. 370.)

"The signature is not rendered invalid by the fact that another guided the hand of the testator when he signed the will. Such an act is the testator's own, performed with the assistance of another, and not the act of another done under the authority of the testator." (40 Cyc. 1104; Jarman on Wills, 5th ed. vol. 1, pp. 106–111; *Points* v. *Nier*, 157 Pac. 44; 30 Am. & Eng. Ency. Law, 2d ed. p. 584; *Sheehan* v. *Kearney*, 35 L. R. A. 102; *Plate's Estate*, 148 Pa. 55; *Watson* v. *Pipes*, 32 Miss. 466; *Cook* v. *Winchester*, 8 L. R. A. 299.)

*Sardis Summerfield* and *A. A. Heer*, for Respondent:

It is true that when once admitted to probate a will must be liberally construed in order to carry out the intention of the testator, but it is equally true that statutes providing the requisites for the execution of a will must be strictly construed in order that a court will not invade the province of the testator and execute a will for the testator himself. (*Estate of Seaman*, 146 Cal. 455, 2 Am. & Eng. Ann. Cas. 726; *Estate of Walker*, 110 Cal. 387; *Sears* v. *Sears*, 77 Ohio St. 104; *Gravil* v. *Barr*, 5 Pa. St. 441.)

By the uncontroverted testimony of those present, the

deceased was unable to write, and having made the "sprawl" remarked that he was too nervous, and requested his hand to be steadied. This being done, the guided legible signature was produced. The "sprawl" can have no effect, either as a mark or a signature, for the reason that it affirmatively appears from the testimony that it was not intended by the deceased to have that or any effect. (*Everhart* v. *Everhart*, 34 Fed. 85; *Plate's Estate*, 148 Pa. 55, Rev. Laws 3913.) "If the statute requires designated formalities, a compliance with such requirements is necessary, * * * but any formalities prescribed by statute in respect of such signing must be strictly complied with." (40 Cyc. 1103.)

As to the testamentary capacity of the testator at the time of the alleged execution of the purported will, this court, under the broad rule relating to the vacating of decisions, supported by unanimous authority, namely, that a decision will not be disturbed where there is any substantial evidence to support it, must, in the very nature of the settled law, decline to reverse the decision of the lower court in this regard. The citation of authorities on this point is unnecessary.

By the Court, McCarran, J.:

William J. Gordon died on July 15, 1915. He was survived by a widow and by a minor heir, William J. Gordon, Jr. In an instrument purporting to be his last will and testament, after making small bequests of money to his wife, to his infant son, William J. Gordon, Jr., and to each of his sisters, he bequeathed the rest, residue, and remainder of his estate, of every kind and character, to one Mary T. Dougherty. An application to have this will probated resulted in a contest, at the inception of which the court appointed attorneys to represent the absent minor heir. The widow was represented in her individual capacity by other counsel.

The record in this case is voluminous. It will, however, we think, suffice to determine the principal point in the case upon a consideration of three propositions

considered by the trial court, and upon which that court, as a final conclusion, refused to admit the will to probate:

"First, did the deceased possess testamentary capacity at the time it is testified that he discussed the making of the will with the draftsman, some time prior to the date he was taken ill?

"Second, did the testator know, at the time it is testified to that the testator signed the will, that it was the instrument he discussed with the draftsman, or ordered him to prepare?

"Third, is the signature of the will the signature of the testator?

1. We shall approach the last proposition first, and in doing so we deem it sufficient to quote the words of the trial court, wherein we find presented a fair resume of the evidence. He says:

"The evidence tends to show that at the time of the alleged signing of the will the testator could hardly see; was seriously ill and very nervous; that in first attempting to sign the will, while propped up in bed, he made the sprawl, and upon one of the witnesses remarking that the signature was not very good, or words to that effect, the testator said, 'I am too nervous,' and requested one of the witnesses to steady his hand; that thereupon, and as testator was propped up in bed, the instrument in front of him on the magazine or cardboard, one of the witnesses proceeded to assist the testator to write his name in the manner following: He put his arm completely around the back of the testator, who held the pen, and in that position, with the witness guiding the hand of the testator, the legible signature William J. Gordon was made."

The court determined that the signature thus made was rendered invalid, but with this conclusion we are not in accord. Our statute (Stats. 1915, p. 36) provides:

"No will * * * shall be valid, unless it be in writing, and signed by the testator, or by some person in his presence, and by his express direction, and attested by

at least two competent witnesses, subscribing their names to the will in the presence of the testator."

That a signature to a last will and testament is not rendered invalid by reason of another having aided the hand of the testator is supported by a line of eminent authorities. (*In Re Miller's Estate,* 37 Mont. 545, 97 Pac. 935; *Vines* v. *Clingfost,* 21 Ark. 309; *Craighead* v. *Martin,* 25 Minn. 41; *Fritz* v. *Turner,* 46 N. J. Eq. 515, 22 Atl. 125; *Sheehan* v. *Kearney,* 82 Miss. 688, 21 South. 41, 35 L. R. A. 102; Jarman on Wills, pp. 106–111.)

In order for this rule to apply, it must appear that the testator, at the time of requesting or receiving the aid in the signing of the instrument, had the present volition to affix the signature, and was aware and fully cognizant of the details of the instrument of will or testament to which he, by the aid of the other, was affixing his signature. The fact that the signature of the testator was made in the manner indicated by the record here would not of itself invalidate that signature. Hence we must decide—and we do this in the light of a harmonious line of authorities—that if the testator in this instance possessed testamentary capacity, was acting under no undue influence, realized the full force and effect of each and every one of the provisions of the will that he was signing, then the signature, in the manner in which it was made, as described by the trial judge, was a valid signature.

**2, 3.** We now take up the second question considered by the trial court, namely: Did the testator know, at the time at which his aided signature was made, that the instrument he was then signing contained the provisions as to the distribution of his estate which he formerly discussed with the draftsman, or ordered him to prepare? The record in this case presents a series of events in the later life of the testator, as well as a condition of mind and body, which must not be overlooked in arriving at a conclusion as to the proper answer to be made to this question.

The trial court which heard the evidence, saw the witnesses, and had opportunity to observe their manner,

conduct, and demeanor, had presented to it, as the record discloses, two sharply conflicting lines of evidence. The testimony of Dr. Hartzell, the physician who attended the decedent during his last illness, the testimony of Roy W. Stoddard, the attorney for the deceased and the draftsman of his will, as well as the testimony of the witness S. R. Tippett, each of the last-named witnesses being most reputable attorneys of splendid integrity, all tends strongly to establish that at the time of the signing of this instrument the deceased, Gordon, was of sound and disposing mind, and was fully aware of what he was doing. On the other hand, the record establishes a condition attendant in the testator, as well as surrounding circumstances, all of which, to say the least, appeared to lead to the catastrophe in his career relieved only by death. The deceased, up to a few months prior to the time of his death had resided in the Eastern States; he came to Nevada for the purpose of securing a divorce; he came here in company with the proponent of this will, the principal beneficiary under the instrument, Mary D. Dougherty, and her aunt, Mrs. Kramer; his wife, from whom he had been estranged, and six-year-old boy were in the Eastern States.

Prior to his coming to this state deceased had been in poor health, and his mental condition is described by his sister, Mrs. Pelton, where, in her deposition, she relates:

"Q. Will you describe your brother's physical condition as you saw it on that day (February 20, 1914)? A. He was very sick; he was losing his sight; he could hardly see.

"Q. As regards your brother's ability to move, to walk freely, what was his appearance? A. It was very difficult for him to walk; he walked with a stick and was led to the door by some man. I don't know whether it was a nurse; he did not say. Some one was taking care of him."

On being further interrogated, she testified:

"Q. Did you talk with your brother at that time, Mrs. Pelton? A. I did.

"Q. For how long were you in conversation with him? A. About an hour.

"Q. As regards his coherence and ability to speak intelligently, what can you say? A. He could not speak intelligently; he could not make two sentences go together.

"Q. Now as regards his mental capacity, as shown by his conversation at that time, will you state what your opinion is? A. I do not think he was capable of doing anything; he did not know what he was doing.

"Q. As compared with his mental condition of prior years, Mrs. Pelton, can you make any comparison? A. None whatever, because he hardly knew me.

"Q. Can you state whether he seemed stronger or weaker mentally than in previous years? A. Very much weaker.

"Q. Can you state whether or not he seemed to be under the immediate influence of say liquor at the time? A. He appeared to be under the influence of something. I do not know whether it was drugs or liquor.

"Q. Did you see your brother again before he went West, Mrs. Pelton. A. Never."

In answer to further inquiry, we find as follows:

"Q. In reference to personal facts in your relations with your brother, was he accurate and clear in regard to his statements? A. Not at all.

"Q. And as to inferences of your brother upon such facts stated, was he rational in his statement of such opinions, or otherwise? A. Certainly not rational."

The testimony of the witness, Mary D. Hartzell, who prior to her marriage to Dr. Reine K. Hartzell on July 27, following the death of Gordon, was Mary D. Dougherty, and the party who, with her aunt, accompanied the deceased from Philadelphia to the city of Reno, is in part as follows:

"Q. Do you know what his (Gordon) primary object was in coming to Reno? A. He came on account of his health and to obtain a divorce.

"Q. Obtain a divorce? Before he left the East and

came out here, did you or did you not have consultations with him with reference to his obtaining a divorce? A. Frequently.

"Q. In the presence of other people? A. Yes.

"Q. Sometimes in the absence of other people? A. I suppose so; I don't remember.

"Q. Who accompanied Mr. Gordon when he left the East and came to Reno? A. Mrs. Kramer, my aunt, and myself.

"Q. I wish you would state to the court, if you are able to say it, Mrs. Hartzell, why you accompanied Mr. Gordon to Reno? A. Because he was very ill; he had no one else to come with him, so he asked me if I would come, and I said if I could get Mrs. Kramer to come with me, I might be able to do so; so I came with him."

On further inquiry the witness testified:

"Q. I wish you would state to the court, Mrs. Hartzell, whether there was any agreement or understanding, express or implied, between you and Mr. Gordon, before you left the East, that in the event he could obtain a divorce that you would become married. A. There was.

"Q. What? A. There was.

"Q. That agreement or understanding was before you left the East, if I understand you correctly? A. It was."

Gordon, as appears from the record, arrived in Reno some time in the latter part of February or the first part of March, 1915. It appears that the decedent was more or less continuously under a doctor's care from the time of his arrival in Reno until his death; but it was not until the 20th of June, 1915, that he became confined to his room and to his bed. At that time, and from that date forward, he appears to have been continuously under the care of Dr. Reine K. Hartzell and three trained nurses. The testimony of Dr. Hartzell discloses a course of treatment attendant with the administration of most powerful drugs and medicines. The charts kept by the trained nurses, and admitted in evidence in this case in the trial court, disclose the mental as well as the physical condition of the decedent during the time from the 20th day

of June until the 30th day of the same month, on which latter day the instrument here in question was signed. These charts disclose, among other things, the following notations made by the attendant nurses:

June 20, between the hours of 12 p. m. and 3 : 20 a. m.: "Irrational."

June 21, 2 a. m.: "Talking irrationally."

June 22, 12 a. m.: "Rambling."

June 23, 3 : 30 to 5 : 45 a. m.: "Talking irrationally."

June 23, 6 : 15 to 7 : 30 p. m.: "Talking irrationally."

June 24, 1 : 45 a. m.: "Talking irrationally."

June 24, 7 a. m.: "Talking irrationally."

June 25, 1 a. m. to 3 a. m.: "Restless, irrational."

June 25, 1 a. m. to 6 a. m.: "Very irrational and talked continuously."

June 25, 6 p. m.: "Irrational all day."

June 26, 2 a. m. to 6 a. m.: "Very irrational." "Irrational from 2 to 6 a. m."

June 27, 4 a. m.: "Irrational."

June 28, 3 : 45 a. m.: "Talking irrationally."

June 28, 5 :30 to 6 p. m: "Very irrational all day."

June 30, 6 a. m.: "Very irrational."

It was between the hours of 5 : 30 and 6 p. m. of June 30 that the will here in question was signed. There is no notation in the clinical chart of that day as to Gordon's condition at or about the hour at which the will was signed. Indeed, there is no notation of the doctor's visit, or of the visit of the party at that hour, although notations of the doctor's visits on other occasions, and at other hours of the same day, are much in evidence in the charts.

The testimony of Attorney Stoddard bears evidence of the affection held by the deceased for his six-year-old boy. The testimony of Mrs. Hartzell makes reference to this as well. In the copy of a letter written by Gordon to a party in the East, of date April 15, we find the following:

"As per our conversation you can see by my address that I have started a Nevada residence.

"As to William, I will do as I said I would, but would like to have it arranged so that I could see him occasionally.

"I am getting a divorce on the grounds of desertion, which you know is true. If I had not been so ill for the past eight months, as you know, I would not have taken this step. I think you understand the situation thoroughly.

"Trusting that you and yours and dear little William are well, I am.    *    *    *    *    "

In another letter to the same party, on April 27, the following appears:

"Your letter received as to my affairs and business relations and different connections, really I have nothing more to say. As per our conversation of recent date, please remember I will do as I have said as to William, also I will get a divorce after I have resided here six months. If you wish to contest any point of course, I am always willing to meet you as a gentleman."

The question before the lower court was as to the testamentary capacity of the deceased at the time at which he signed the instrument in which he practically disinherited his infant son. The condition of the testator on this occasion was a fact to be arrived at and determined. This court, as well as other courts of review, have repeatedly said that where, on a question vital to the issue, there is a substantial conflict in the evidence, the determination of the trial court will not be disturbed if the same is supported by substantial evidence. To say that there is no conflict of evidence here, to say that the decision of the lower court was not supported by substantial evidence, would be to disregard entirely the mental condition of the testator as indicated by the testimony and as evidenced by the clinical charts made by the trained nurses, who, as we must assume, used the terms found there advisedly. The physical weakness, and indeed the mental condition, of the decedent, was evidenced in no small degree by the pitiable scrawl found in the will, made by his own hand.

With a weakened physical and mental condition which the record shows extended at least as far back as February 20 treated internally, hypodermically, intravenously with medicines of which in almost every instance arsenic was a component factor, he passed through successive days, from June 20 to June 30 when those in charge noted his conduct at intervals as "irrational." On the last-named date the deceased performed an act which, to say the least, had all of the elements of being unnatural, wherein he eliminated his infant son from substantial participation in his estate. In view of all this, as borne out by the record, we are unable to say that the decision of the trial court, wherein it determined that at the time of the signing of the will the testator did not know what he was signing, was not supported by substantial evidence.

It is not for us to say whether, if the matter was before us in the first instance, we would have arrived at the same decision as was arrived at by the lower court. The question before us as it is presented here on review, is whether there is in the record substantial evidence to support the determination of that court, in view of what we perceive to be a substantial conflict.

Counsel for appellant assign error to the action of the lower court in appointing certain attorneys to supersede others in representing the minor heir. If error, it was such as could scarcely be considered prejudicial to the interests of appellant in the matter so far as it has proceeded. We do not assume to determine the propriety of the action. The error, if such it be, might be properly considered if the matter involved the question of the allowance of fees, or other matters of similar import.

The order of the lower court in refusing to admit the will to probate must, as we view it, be affirmed.

It is so ordered.

NORCROSS, C. J., concurring:

I concur in the opinion and in the judgment and order. While the question of the capacity of the testator at the

time of executing the will is an exceedingly close one, I think it cannot be said, as a matter of law, that the evidence is insufficient to support the judgment.

COLEMAN, J., dissenting:

I dissent.

By a great weight of authority in the United States, it is held that in a will contest the burden of proof rests upon the person asserting the lack of capacity of the testator to make the will. (40 Cyc. 1018.) Instead of the contestants having shown by a preponderance of the evidence that the testator lacked mental capacity to make a will, I think it can be said there is no evidence worthy of serious consideration tending to show lack of mental capacity at the time the will was executed. There were only three persons present when the will was executed—two lawyers and a doctor—and all three of them testified that the mind of the testator was clear. It is sought to overcome this testimony by evidence of his sister given as to his condition in February, 1915, when she was negotiating with him to purchase his interest in the estate of a deceased brother, and of his general ill health. His sister, Mrs. Pelton, testified:

"Q. The fact that he had told you that he had been in the hospital for his health, that his eyesight was defective, and that he desired to go West for his health, or words to that effect, and that he was in need of money, didn't impress you as being irrational, did it? A. That particular statement didn't.

"Q. Did any of those things I have mentioned? A. No.

"Q. As to those particular things he seemed to be rational? A. Yes.

"Q. Please state what he said on that occasion. that indicated irrationality? A. He talked in a very irrational way.

"Q. What did he say? A. He said that his wife had left him, that he had this little boy that he wasn't allowed to see, that he was very unhappy, and that he had somebody who was very fond of him taking care of

him; that he would like to go back to the West if he did not get well; he would like to go West, and asked me if I would help him go. He asked me to telephone him the next day, and I said I would. I did, and I could not get him. The next thing I knew he had gone West.

"Q. Will you be so kind, Mrs. Pelton, as to tell us what particular acts that you enumerated in your last answer impressed you as being irrational? A. In the first place, I could not get him on the telephone. He wanted money, and when he had a chance to get it he didn't telephone.

"Q. What acts and statements have you described? A. Do you mean in regard to his going away?

"Q. What particular things .have you stated in that answer that impressed you as being irrational? A. Because one minute he wanted to go to the hospital, and the next he wanted to go away. He wanted to go back to his wife. That struck me as not to be natural. * * *

"Q. You said it was not the fact that he wished to raise money, but something about the way of selling it, that impressed you as irrational? A. I didn't think he should.

"Q. Why should he not have sold the interest. A. Because it should not have been sold out of the family. It struck me as an unnatural proceeding."

It appears from the testimony of this witness, as given in the opinion of the court and this dissent, that when she saw the testator he was under the influence of liquor or drugs. Most men are irrational when in that condition. But I submit that when her testimony on cross-examination, as quoted herein, is considered there is nothing to sustain the idea that the testator was insane at the time of the meeting of the testator and his sister; in fact, when boiled down, her testimony shows conclusively that she did not base her statement that the testator was irrational upon his appearance, words, and actions when she saw him in February, 1915, but upon the fact that he sold his interest in an estate out of the family—an incident which transpired after she saw him

in Philadelphia. And this, too, notwithstanding the fact that in all probability he received more for it than she was willing to pay. It was a very insane thing to do, possibly; but we usually regard as rational an effort to get the most we can for property.

. Testator arrived in Reno about April 1, 1915, and shortly thereafter had some correspondence with one Malcolm Chase, of Boston, who apparently was acting for Gordon's wife in which she sought to overthrow some transaction of Gordon's. In one of his letters Chase says:

" * * * I cannot see, now that he has paid you, that it makes any difference to you one way or the other."

What is this but an endeavor to influence Gordon to practically repudiate his transaction? In his reply, Gordon says:

" * * * I shall not permit nor be a party to any such dishonest scheme and am surprised and indignant to think that you would propose anything of the kind to me, for you know that I do not do that kind of business."

This letter was written from Reno May 27, 1915, three or four months after he had had the negotiations with his sister for the sale of the interest. Does this letter indicate a weak, incompetent mind? We can almost see the passion with which he wrote flashing from his eyes. I think this letter shows beyond question that testator's mind was not only clear, but vigorous, on May 27, 1915. The attorney who drafted the will was consulted about the making thereof and its proposed terms as early as April, and on numerous occasions up to the day of its execution, and all of the talk was upon the basis upon which it was finally executed. The learned trial judge found that the testator possessed a clear, sound mind when he talked over the making of the will with the attorney some time prior to its execution. In his written opinion, he asks this question:

"Did the testator possess testamentary capacity at the

Coleman, J., dissenting

time, it is testified, that he discussed the making of a will with the draftsman, some time prior to the date when he was taken ill?"

In the opinion the court answers this question as follows:

"Considering all the evidence before it, the court answers the first question in the affirmative."

Before proceeding further, I will quote from the opinion of the trial judge. He said:

"After carefully considering the evidence, the court is unable to say that there was any fraud, conspiracy, or undue influence in the case."

In another place he uses this language:

"The evidence showed that the testator on several occasions discussed the proposition of making a will, with the attorney who drafted the instrument, and, on one occasion at least, in the presence of the principal legatee. It seems that the testator on that occasion was requested by the principal legatee to give the trust fund to the boy or minor child of the testator and the testator's wife, and his reply at that time was that the principal legatee could look after the boy."

Thus it will be seen, if we accept the views of the trial court (and on these points there is no dispute here), that some time prior to the execution of the will, the testestator was of a sound mind, and that no fraud or undue influence was perpetrated or exerted to induce the making of the will which was executed. Upon the argument in this court it was stated by counsel for contestants (and not denied) that the estate was practically of no value.

With the finding of the trial judge that testator was sane at the time he discussed the making of the will before us, what, let us ask, is the evidence of insanity at the time of the execution of the will? None, unless it be general ill health, the terms of the will itself, and the charts. That mere general ill health is no ground to declare a will void is a rule of law which should require no citation of authority to sustain it, but for the

general rule reference may be had to 40 Cyc. 1009. As I read the record in this case, the fact that the testator left his son only $100 should not weigh for much in determining the mental condition of the testator. In the first place, he seems to have had no estate of any consequence; besides, his wife had deserted him five years before and taken the boy, and, so far as appears, the wife may have been amply able to support herself and son; and under all the circumstances surrounding their life—their respective means—he may have felt, and no doubt did feel, justified in leaving his son only $100. There was no evidence as to the wife's financial condition, but the lack of evidence on this point is due to her voluntary action. She was in court in person and by attorney during the trial, when the attorney who was appointed by the court to represent the minor heir, apparently over the objection of the mother, stated that he would on the following day call as a witness testator's wife. When court opened the following morning, it was found that Mrs. Gordon did not occupy her accustomed chair. Upon request of counsel appointed by the court, a bench warrant was issued for her, and it developed that she had left the state the night before. Evidently she was not very anxious to aid in the contest made on the will; she was no doubt satisfied to support the son herself. In view of this circumstance, and of the apparent paucity of the estate, should we attach any particular significance to the fact that testator left only $100 to his son? I think not.

As to the charts, they show just exactly what is noted upon them, and nothing more. If Mr. Gordon had been continuously irrational, it is apparent that no notations would have been made. It is evident that the notations were made for the purpose of showing just what his condition was at or about the time they were made. We do not make notes of the usual, but of the unusual. This is true of things generally, and any one who has had the

least experience in a sick room knows this to be the practice. Furthermore, the undisputed and unquestioned testimony in this case shows clearly that the notations on the charts referred only to the hour when made. The last notation on the charts of the irrational condition of Mr. Gordon, as shown by the opinion of the court, was at 6 a. m., June 30. The fact is that the charts show the next notation of his having been irrational at 12 p. m., July 4. The will was executed at 5: 30 p. m., June 30. Thus we see from the charts, the only record evidence in the case, that the testator was in normal mental condition at the time the will was executed; and this record evidence is corroborated by the undisputed testimony of three persons who were present at the time of the execution of the will; and it is shown by the evidence that the will which was executed was the will which testator outlined as the will he desired to make when talking over with his attorney its preparation at a time when the trial judge in his written opinion found Mr. Gordon to have been of sound mind.

I am clearly of the opinion that the order and judgment appealed from should be reversed.

*Per Curiam* (COLEMAN, J., dissenting) :
Petition for rehearing denied.