IN RE NOYES' ESTATE.   NOYES, RESPONDENT, *v.* GERARD,
ACTAPPELLANT.

(No. 2,733.)

(Submitted December 14, 1909.   Decided December 18, 1910.)

[105 Pac. 1013.]

*Probate  Proceedings—Wills—Execution—Authentication—Publication—Evidence—Insufficiency.*

Wills—Execution—Authentication—Mandatory Statutes.
1.   The rules prescribed by the legislature touching the execution and authentication of wills are mandatory and must be strictly complied with.

Same—Construction—Probate.
2.   While a will, after probate, should be liberally construed in order to give effect to the testator's intentions, upon application for probate, the question of his intent does not enter into the determination whether the requirements of the statute relative to the execution and authentication of the instrument have been complied with.

Same—Probate—Publication—Evidence—Insufficiency.
3.   Where one of the two subscribing witnesses did not hear the will read, was not requested by anyone to sign as a witness to a will, did not see the signature of the testator, and was not informed of the character of the paper he signed, until nearly two years later, the testator did not publish the writing as his will as required by section 4726, Revised Codes, and probate thereof was properly denied.

*Appeal from District Court, Yellowstone County; Sydney Fox, Judge.*

IN THE MATTER of the Estate of Horace A. Noyes, deceased. J. S. Noyes, as plaintiff, appeared and contested a writing offered by Sarah Gerard, defendant, for probate as decedent's last will. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

*Mr. W. M. Johnston* submitted a brief in behalf of Appellant, and argued the cause orally.

Under the evidence in this case all of the statutory requirements were complied with in the execution of the instrument in question. The authorities are legion which hold that it is not necessary for the testator to expressly declare in so many words

that the instrument is his will and that he desires the witnesses to attest the execution of the same. This may be inferred from his conduct, by his acquiescence in what is said or done, by the statement and request being made by the person who drew the will, or in any other way so as to render certain the fact that he knew what he was doing and was in no way being imposed upon, and that there was no opportunity for any fraud to be practiced upon him. (See *In re Miller's Estate*, 37 Mont. 545, 97 Pac. 935; *Hildreth* v. *Marshall*, 51 N. J. Eq. 241, 27 Atl. 465; *Denny* v. *Pinney's Heirs*, 60 Vt. 524, 12 Atl. 108; *Coffin* v. *Coffin*, 23 N. Y. 9, 80 Am. Dec. 235; *Gilbert* v. *Knox*, 52 N. Y. 125; *In re Voorhis' Will*, 125 N. Y. 765, 26 N. E. 935; *Robbins* v. *Robbins*, 50 N. J. Eq. 742, 26 Atl. 673; *Elkinton* v. *Brick*, 44 N. J. Eq. 154, 15 Atl. 391, 1 L. R. A. 161; *In re Nelson's Will*, 141 N. Y. 152, 36 N. E. 3; *Burney* v. *Allen*, 125 N. C. 314, 74 Am. St. Rep. 637, 34 S. E. 500; *In re Johnson's Estate*, 152 Cal. 778, 93 Pac. 1015; *In re Barry's Will*, 219 Ill. 391, 76 N. E. 577; *Savage* v. *Bowen*, 103 Va. 540, 49 S. E. 668; *In re Claflin's Will*, 73 Vt. 129, 87 Am. St. Rep. 693, 50 Atl. 815; *Ames* v. *Ames*, 40 Or. 495, 67 Pac. 737; *Meurer's Will*, 44 Wis. 393, 28 Am. Rep. 591; *Trustees* v. *Calhoun*, 25 N. Y. 425; *Smith* v. *Holden*, 58 Kan. 535, 50 Pac. 447.)

No special request by the testator to the witnesses to sign the will as witnesses thereto is necessary. If they sign in his presence and without objection on his part, he knowing the fact that they are signing as witnesses, it is sufficient. (*Meurer's Will, supra; Savage* v. *Bulger*, 25 Ky. Law Rep. 763, 76 S. W. 361; *In re Morgan's Estate*, 219 Pa. 355, 68 Atl. 953; *In re Lillibridge's Estate*, 221 Pa. 5, 128 Am. St. Rep. 723, 69 Atl. 1121.)

The authorities are a unit in holding that no attestation clause is necessary. (1 Woerner on Administration, 71.)

*Mr. Chas. A. Taylor*, and *Mr. Harry L. Wilson* filed a brief in behalf of Respondent. Oral argument by *Mr. Wilson*.

The legislature has seen fit to prescribe the manner in which a will shall be executed and attested. These statutory provi-

sions are mandatory in their terms. We submit that when the statute says "the testator must declare to the attesting witnesses that the instrument is his will," it is idle to urge that compliance with this requirement is shown by proof of the fact that the testator said nothing to them. And when the statute provides that each of the attesting witnesses "must" sign his name at the testator's request, it does not mean at the request of some person, unless the testator, being present, signifies his assent to such request by word, act, sign or motion, or in some manner evidences his acquiescence therein. (*In re Walker's Estate*, 110 Cal. 387, 52 Am. St. Rep. 104, 42 Pac. 815, 30 L. R. A. 460; *Estate of Seaman*, 146 Cal. 455, 106 Am. St. Rep. 53, 80 Pac. 700.)

When one of the two attesting witnesses testifies distinctly that there was no publication of the will, and the other witness fails to recall whether the testator declared the instrument to be his will, it should not be admitted to probate. (*Newton's Will*, Tuck. (N. Y.) 349.) To prove the execution of the will, it must be shown that the witnesses who subscribed their names to it did so at the request of the testator; that they saw him sign it, heard him acknowledge it, or observed acts which unmistakably indicated that he had signed it. The acknowledgment, however, cannot be inferred from mere silence. (*Haynes* v. *Haynes*, 33 Ohio St. 598, 31 Am. Rep. 579; *Luper* v. *Werts*, 19 Or. 122, 23 Pac. 851; see, also, *In re O'Neil's Will*, 91 N. Y. 516; *Sisters of Charity* v. *Kelly*, 67 N. Y. 409; *In re Conway*, 124 N. Y. 455, 26 N. E. 1029, 11 L. R. A. 796; *In re Andrews' Will*, 162 N. Y. 1, 76 Am. St. Rep. 294, 56 N. E. 529, 48 L. R. A. 662; *In re Whitney's Will*, 153 N. Y. 259, 60 Am. St. Rep. 616, 47 N. E. 272; *In re Blair's Will*, 32 N. Y. Supp. 845; *Hays* v. *Harden*, 6 Pa. 409; *Glancy* v. *Glancy*, 17 Ohio St. 134; *Ludlow* v. *Ludlow*, 36 N. J. Eq. 597.)

While the authorities hold that an attestation clause is not necessary where proof of due and legal execution may be had from other sources, yet in the case at bar, there being no attestation clause of any kind, or in any form, and the proof being wholly insufficient to show due or legal execution or attesta-

tion of the instrument, we submit that it presents a state of facts widely different from those involved in the case of *In re Miller's Estate,* cited by appellant. The other cases cited by appellant, under the general proposition that it is not necessary for the testator to expressly declare in so many words that the instrument is his will, and that he desires the witnesses to attest the execution of the same are not applicable to the state of facts presented in the case at bar.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Horace A. Noyes died on or about January 16, 1909, at Laurel, in Yellowstone county, leaving an estate therein consisting of real and personal property. On January 25, 1909, Sarah Gerard, the defendant, filed a petition in the district court of Yellowstone county, asking that a writing attached thereto, and purporting to be the last will and testament of Horace A. Noyes, be admitted to probate. By the terms of the writing the defendant is given the whole of the estate of the deceased, subject to the claims of creditors and to the payment of $10 to each of several legatees mentioned by name, being a niece, three sisters and a brother. One Edward L. Fenton was named as executor, and the defendant prayed that letters testamentary be issued to him. J. S. Noyes, the plaintiff, brother of the deceased, appeared and contested the probate of the writing as a will, alleging as grounds therefor, among other things, that the subscription of his name to the instrument by the testator was not made in the presence of the attesting witnesses; that it was not acknowledged by the testator to the witnesses, or either of them, as made by his authority; that the testator did not at the time of subscribing his name, or at any time, or at all, declare to the attesting witnesses, or either of them, that the instrument was his will; and that neither of said witnesses signed his name as a witness to the instrument at the request of testator. The defendant filed her answer, denying specifically all of these allegations. The issues thus made were tried by the

court sitting without a jury, and resolved in favor of the plaintiff. Judgment was entered accordingly. The defendant has appealed from the judgment and an order denying her a new trial. The questions submitted for decision arise upon defendant's assignment that the evidence is insufficient to sustain the findings, and may be stated as follows: (1) Did the deceased at the time of signing the instrument in question publish it as his last will and testament, as required by the laws of Montana? (2) Did the witnesses, when they signed as such, do so at the request of the deceased?

The instrument bears the signature of the deceased, attested by two witnesses, but without an attestation clause. It was written by Fenton on May 4, 1907, at the request of Noyes, who was confined to his bed by the disease which resulted in his death. The only evidence heard was that of Fenton and the two subscribing witnesses. What occurred at the time is stated by them substantially as follows:

Fenton stated: He was postmaster at Laurel, the village where Noyes resided. He was sent for by Noyes, who was then confined to his bed in a room at the rear of his saloon. When he arrived, he found Conant, one of the subscribing witnesses, with Noyes. Noyes was then perfectly rational, and understood what was going on about him. After some conversation between Fenton and Noyes, the latter told Fenton that he had an old will in his trunk, which he directed Fenton to get, because he desired to have it changed in some particulars, and for this purpose desired a new one drawn. This paper purported to be a holographic will. Fenton then went to the postoffice, and, after having procured writing materials, wrote the will as, directed by Noyes. During the time the directions were being given different persons came in and went out of the room, but who they were or whether anyone was present he did not remember. After he finished the writing, he read it to Noyes. He could not say who was then present. After the reading was finished, but before Noyes signed, he called Klamer, one of the subscribing witnesses, from the saloon, and told him he de-

sired him to sign the will as a witness. This information was given the witness as he entered the room from the saloon. Conant was then present. Noyes signed after Klamer came in, having raised himself in bed for that purpose. It was then attested by Conant and Klamer. The room was in size about twelve by fourteen feet, and Noyes could hear all that was said. After the signatures were attached, both of the papers were intrusted to Fenton, who thereafter kept them until Noyes' death. Conant signed first, and Klamer immediately afterward. On cross-examination the witness stated: He did not think both witnesses were in the room when he read the will. Noyes did not speak to either of them during this time, nor personally request either to sign. The request was made by Fenton. He told Noyes that two witnesses were required, and then requested Conant and Klamer to sign.

Klamer stated: He remembered signing what he was informed by Fenton was Noyes' will in the back room of the saloon. He identified the paper in controversy as the one witnessed by him in the presence of Noyes, but knew nothing of its contents. He saw Noyes sign it. Conant then signed it; the witness signing immediately afterward. Noyes seemed to be perfectly rational, and was not laboring under any restraint or undue influence of any kind. Witness was called into the room by Fenton from the rear of the saloon where he was then sitting. Fenton beckoned him into the room where Noyes was, and, as he entered, asked him in Noyes' presence if he would witness the will. The door leading into the room from the saloon was open. Conant was then present. Witness supposed Noyes could hear all that was said, since he could hear well, and was wide awake and in full control of his faculties. Though the witness talked with Noyes immediately afterward, nothing was said by either of them about the fact that Noyes had just made a will or as to the contents of it. Nothing was said about the will whatever while he was in the room, other than what Fenton said when he requested the witness to attest it. He knew that he was witnessing a will only by what Fenton said to him.

Questioned further, the witness stated he could not say definitely whether, when Fenton informed him that it was desired that he should act as a witness; he was in the saloon or in the room where Noyes was; nor could he say whether Noyes heard what was said by Fenton. Nothing was said about the will while he was engaged in witnessing it.

Conant stated: He knew Noyes. He attached his signature to the paper purporting to be the will in controversy. He did so at the request of Fenton. Fenton, Klamer, and he were present. Noyes said nothing about the character of the paper. Witness did not hear Fenton ask Klamer to sign as a witness. He himself signed first, followed by Klamer. The paper was at the time of signing so folded that he could not see the signature of Noyes. He learned nothing of the nature of the paper until after the death of Noyes. Fenton merely asked him to sign the paper as a witness, without stating to him the nature of it. He did not know its nature. He could not say whether he saw Noyes sign or not, and, when he first saw the paper, it was in Fenton's possession. He could not say that he saw it in Noyes' possession at all. He was in and out of the room during the time Fenton was present, engaged in preparing Noyes for removal to a hospital at Billings. He did not remember seeing Fenton help Noyes to a sitting posture to sign the paper, and did not remember having heard Fenton ask Klamer to witness Noyes' will. Though present when Fenton first came into the room, he did not hear Noyes request Fenton to draw his will. He did not see Fenton get the old will from the trunk. Beyond a surmise, based upon the fact that Noyes was sick, that the paper witnessed was probably a will, he did not, in fact, know what it was. He had called on Noyes that morning, and, at his request, had remained to wash and prepare him for removal to the hospital. Fenton and Klamer entered the room together; Fenton then having the papers, and remarking: "June [referring to Noyes] has got some papers here, and I wish you to sign as witness." This was said in Klamer's presence. He could not say whether this was after Noyes signed or not. He

could not at the time he signed see Noyes' signature on the paper, because of the way in which it was folded. Several questions were put to him on cross-examination, with the apparent purpose of laying a foundation for impeachment; but no other evidence was offered on behalf of either party.

Section 4726, Revised Codes, so far as pertinent here, provides: "Every will, other than a nuncupative will, must be in writing; and every will, other than a holographic will, and a nuncupative will, must be executed and attested as follows: * * * (3) The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; and (4) There must be two attesting witnesses, each of whom must sign his name as a witness, at the end of the will, at the testator's request, and in his presence."

The right to make a testamentary disposition of property is not an inherent right; nor is it a right guaranteed by the fundamental law. Its exercise to any extent depends entirely upon the consent of the legislature, as expressed in the statute enacted on the subject. It can withhold or grant the right, and, if it grants it, it may make its exercise subject to such regulations and requirements as it pleases. It may declare the rules which must be observed, touching the execution and authentication of the instruments necessary to indicate the testator's intention and make a compliance with them mandatory. (*In re Walker's Estate*, 110 Cal. 387, 52 Am. St. Rep. 104, 42 Pac. 815, 30 L. R. A. 460.)

In *Re O'Neil*, 91 N. Y. 516, it was said: "While the primary rule governing the interpretation of wills, when admitted to probate, recognizes and endeavors to carry out the intention of the testator, that rule cannot be invoked in the construction of the statute regulating their execution. In the latter case courts do not consider the intention of the testator, but that of the legislature. In considering the question stated upon authority, some cases are found which apparently sustain the contention of appellant's counsel. In all of them, however, there was a

failure to observe the rules of construction which we consider
controlling. We think, however, that the weight of authority
favors the theory that the statute fixes an inflexible rule by
which to determine the proper execution of all testamentary
instruments.'' This was said in discussing a will in the execu-
tion of which the testator and witnesses had failed to subscribe
at the end, as required by the statute. In *Re Walker's Estate
supra,* the supreme court of California, after stating that the
observance of the requirements of the statute is a prerequisite
to the effective exercise of the testamentary right, said: ''It is
not for the courts to say that these requirements, or any of them,
are mere formalities, which may be waived without impairing
the status of the instrument. It is not for courts to say that
a mode of execution or authentication, other than that pre-
scribed by law, subserves the same purpose, and is equally effi-
cient to validate the instrument. The legislative mandates are
supreme, and there is no right to make testamentary disposition
except upon compliance with those mandates. It may be freely
conceded that the question under consideration is of a nature
purely technical, but it is to be remembered that the whole
subject matter of the execution and authentication of wills is
technical, and nothing else; and it must not be forgotten that
the technicalities are those which the law-making power has the
right to impose, and has imposed, upon the maker of a will.''

The purpose of the formalities prescribed is to prevent simu-
lated and fraudulent writings from being probated and used
as genuine. While the application of the strict rule of construc-
tion may sometimes defeat the intention of the testator as mani-
fested by an imperfectly executed and authenticated writing,
yet in the long run such statutes tend to promote justice, by
lessening, so far as possible, the opportunity for fraud, which
history and experience have demonstrated to be feasible and
measurably safe in the absence of them. (*Estate of Seaman,*
146 Cal. 455, 106 Am. St. Rep. 53, 80 Pac. 700.) After the
writing is shown to have been executed and authenticated by
observance of the technical requirements which the legislature

has imposed, then the instrument will be construed liberally in order to give effect to the testator's intention. Upon the application for probate, however, the sole inquiry about which the court is concerned is whether these requirements have been complied with. The courts may not, therefore, out of regard for the supposed intention of the testator, however clearly it may be manifested by the attendant circumstances, adopt a rule which would open the way for the same frauds which the statute was designed to prevent. The restrictions made by it are reasonable and easily understood, and, as experience has shown, it is far safer for society that a rule be adopted that requires a strict compliance with them, and, as a consequence, that occasionally an honest attempt to execute a will be defeated, than that the protections thus thrown about the testator should be disregarded because of an undue respect for his intentions, and the way be left open for the multitude of frauds and perjuries which would result.

Since the right to make testamentary disposition is dependent upon the will of the legislature, it is no hardship upon anyone that the mode and formalities by which it may be effectively done are made mandatory by the same power. This rule of interpretation is recognized and applied by the courts generally, both in England and in this country, whether the particular formality involved refers to the place of the signature of the testator, or the fact that he signed or made acknowledgment in the presence of the witnesses, or that he made publication, or that the witnesses have properly signed in his presence, and in the presence of each other and at his request. All of these formalities stand as of equal importance, and all must be observed. (*Dallow's Case*, 1 L. R. 189; *Haynes* v. *Haynes*, 33 Ohio St. 598, 31 Am. Rep. 579; *Hays* v. *Harden*, 6 Pa. 409; *Glancy* v. *Glancy*, 17 Ohio St. 134; *Luper* v. *Werts*, 19 Or. 122, 23 Pac. 850; *Matter of Whitney*, 153 N. Y. 259, 60 Am. St. Rep. 616, 47 N. E. 272; *Richardson* v. *Orth*, 40 Or. 252, 66 Pac. 926; *Ludlow* v. *Ludlow*, 36 N. J. Eq. 597; 30 Am. & Eng. Ency. of Law, 2d ed., 574.)

Counsel for defendant has cited many cases wherein wills were admitted to probate under particular circumstances. But in each case the facts were such as to justify the conclusion that the statutory requirements had been substantially complied with. The case of *Coffin* v. *Coffin*, 23 N. Y. 9, 80 Am. Dec. 235, is an illustration. There one of the questions was whether one of the witnesses had signed at the testator's request. One of the witnesses asked the testator in the presence of the other: "Do you request me to sign this paper as your will as a witness?" The testator answered in the affirmative. This was held a request to both witnesses, and a sufficient publication of the will. So, again, in *Trustees* v. *Calhoun*, 25 N. Y. 422, it was held that where one of the witnesses asked the other in the presence of the testator to sign as a witness, after stating that the paper she was called to sign was the will, it was held that this was sufficient to show a publication, even though the latter witness stated that she did not think that the testator, being deaf, heard all that was said; the other subscribing witness having testified that the testator had fully explained to her the purpose for which she had been called. Again, in *Re Johnson*, 152 Cal. 778, 93 Pac. 1015, it was held that it was not necessary that it be made to appear that a testatrix upon executing her will had expressly declared to the subscribing witnesses that the document executed was her will, and expressly requested them to attest it, but that it was sufficient if by her words or her conduct at the time she conveyed to them the information that the document was her will, and that she desired them to subscribe it as witnesses. The same rule was recognized and applied by this court in the case of *In re Miller's Estate*, 37 Mont. 545, 97 Pac. 935. There is no fault to be found with the rule thus declared. The condition presented in this case, however, does not permit its application. However much disposed we might be to find for defendant and uphold the will in controversy here, if we were authorized to disregard the findings of the district court, and make independent findings, upon the record in this case the findings are based upon conflicting evidence. We

are concluded by them. If the evidence had been submitted to a jury, either party having the right to demand a trial by jury (Revised Codes, sec. 7397), the verdict would have been conclusive. That the findings were made by the court does not change the rule. While the testimony of Fenton and Klamer might furnish a basis for the conclusion that Conant heard the will read and heard Fenton call Klamer and request him to join in the attestation, and that for this reason the request and publication were sufficient, because it appears from their testimony that Noyes signed in his presence after this occurred, yet the fact remains, if Conant's testimony is to be taken as true—and we must assume that it was so taken—that he did not see Noyes sign, did not see his signature, was not informed even by Fenton that the paper was a will, and did not definitely learn the fact that Noyes had made a will until after his death, nearly two years later. It may well be said that Conant's testimony is not satisfactory, in that in some important particulars he is not positive and definite in his statements; nevertheless the credit to be given it was a question exclusively within the province of the trial court to determine, and its determination thereon is conclusive.

Counsel cites with confidence the decision of this court in the case of *In re Miller's Estate, supra,* and contends that the circumstances surrounding the execution of the will of Mrs. Miller were substantially the same as appear here. There, however, the circumstances, taken together, left room for one inference only, viz., that all the requirements of the statute had been substantially met. One of the subscribing witnesses stated that the testatrix did not say anything to him about the will or to anyone in his presence, but that he saw her with the pen in her hand as she was signing it, that she was perfectly rational, and that he attested the signature in her presence at the request of her attorney. Furthermore, it appeared that the will had been read to her in the presence of the witnesses and others, and that she thereupon signed it. Here one of the subscribing witnesses did not hear the will read, was not requested by anyone to sign as a witness to the writing as a will, did not see the

signature of the testator, and was not informed of the character of the paper until nearly two years later. The testator therefore did not, within the meaning of the statute, either make publication of the writing as his will or request both witnesses to attest it.

The judgment and order must therefore be affirmed.

*Affirmed.*

Mr. Justice Smith and Mr. Justice Holloway concur.

(Submitted December 14, 1909. Decided December 24, 1909.)