IN RE CISSEL'S ESTATE. CISSEL, RESPONDENT, *v.* ROSENKRANZ ET AL., APPELLANTS.

(No. 7,611.)

(Submitted March 4, 1937. Decided March 24, 1937.)

[66 Pac. (2d) 779.]

*Mr. J. J. McIntosh* and *Mr. D. L. O'Hern,* for Appellants, submitted an original and a reply brief, and argued the cause orally.

*Mr. F. F. Haynes*, for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an appeal from a judgment denying probate of a purported will of William B. Cissel, deceased.

The will was executed February 17, 1933. Deceased died October 13, 1935, at the age of 85 years. The record discloses that he left surviving him his widow, two sisters, and some nieces, grandnephews, and grandnieces. He bequeathed one-third of his real estate to his wife, with the added provision, however, that there was to be deducted from this bequest an advancement of $3,500, claimed to have been made to her during his lifetime. The rest of the estate, real and personal, was bequeathed to a niece. Fred W. Rosenkranz was named executor to act under bond, and J. J. McIntosh, drawer of the will, was named attorney for the estate. Carrie P. Cissel, widow, was the sole contestant below, and she is the respondent here.

The contest was tried to the court without a jury, upon the ground that deceased was mentally incompetent at the time the will was executed, for a long time prior thereto, and at the time of his death. This condition was denied by the niece and executor, who are the appellants here.

The evidence shows that deceased and his wife had been married 38 years and had lived together on a small farm near

Forsyth. By their mutual efforts they had accumulated considerable property consisting, in addition to the home place, of a small farm near by and some town property. A' bank failure in 1923 caused them to lose about $12,000 of their accumulations. Their labors, for the main part, were devoted to farming and truck gardening; they marketed their produce at Forsyth and to neighbors.

Among the findings of the court which have support in the evidence was the fact that the wife was dutiful, considerate, and "proper," and that no children were born as issue of their marriage. Another finding was that in 1927, testator, being then of sound and disposing mind and knowing the natural objects of his bounty, had made a lawful will in which he left all of his property to his wife. This will was apparently destroyed, and was subsequently revoked by express provision in the will which is now the subject of contest. The court also found that there had been no advancement as claimed in the will, and that the intention of deceased was to completely disinherit his widow.

The trial court has afforded us an unusual opportunity to observe and understand its reasons for the judgment rendered. The order denying admission of the will to probate and making findings of fact and conclusions of law is in the record. We take occasion at this point to quote from that order, as follows:

"The testimony is voluminous and it is unnecessary to review it at length. Suffice it to say, I carefully considered it during the trial and have again given it serious attention with the aid of the excellent briefs of counsel. The evidence is conflicting and it may be tersely summarized as follows: On contestant's side it appears that the deceased for five years before his death was forgetful and childish; that he was addicted to the excessive use of intoxicating liquor; that his conduct in many respects was reprehensible and disclosed a mental deterioration, and that he was subject to delusions. In short, the deceased was afflicted with senile dementia. On behalf of the

proponent, the deceased was pictured as a man of declining years but still capable of managing his business affairs; that he attended to his business in an efficient manner, and that he was of sound mind at the time of the execution of the will which is offered for probate. However, there is a persuasive thing that impels the court to adopt the theory of the contestant. It is but natural that a person who has lived with his helpmate for about thirty-eight years, and that association being in the main agreeable, should see to it that upon his death she would not be the object of charity if his estate could avoid it. Her welfare would be the foremost thought of a person in full possession of his normal mental faculties, and especially is this true if that helpmate had labored with him in the accumulation of his estate. Here we find that the highest value placed on the real estate is $8,000, and according to the purported will the widow is to receive one-third thereof, or the share that she is given as a matter of right under the law, but she is chargeable with $3,500 which the deceased claimed to have advanced her in his lifetime, although the proof is lacking that any such advancement was ever made. So if the will is upheld, it can readily be seen that the widow does not receive a penny; on the contrary she is indebted to the estate, and all of the property of the deceased goes to a niece whom he had not seen for sixteen years prior to his death. Such a disposition of his property, in view of all of the circumstances in this case, is so repugnant to fair play that it indelibly stamps the testator as a man unable to understand the extent of his property and the relationship he bore to the person who should naturally be the object of his bounty.''

The assignments of error go to the refusal of the trial court to adopt proponent's findings of fact and conclusions of law directing the admission of the will to probate. These assignments resolve themselves into the single question, viz.: What was the mental condition of the testator at the time the will was executed?

In disposing of this case, we must necessarily have in mind some of the well-settled principles of law which arise in connection with a will contest on the ground of testamentary incapa- ■ city. It will be noted that the trial judge found from the evidence that the deceased was afflicted with advanced senile dementia. This, briefly stated, is a form of dementia or insanity which occurs in old age and which is characterized by hopeless decay or loss of mental faculties. (See the following texts: Maloy on Nervous and Mental Diseases, p. 350; Smoot on Insanity, p. 70; Singer & Krohn on Insanity and Law, p. 84.) These authorities give a fair and comprehensive review of the symptoms and characteristics incident to this form of insanity. It follows from the very nature of the disease that one so afflicted is not necessarily in all stages without testamentary capacity. The disease is progressive in character, and it is in its advanced stages that the sufferer generally lacks testamentary capacity. (Herzog's Medical Jurisprudence, sec. 700, p. 518.) It was very aptly announced by Maloy in his work above cited, as follows: "He who lives until the mellowness of age softens his life, but dies before his faculties are impaired or lost may be considered fortunate. He avoids the stigma that is attached to senile dementia."

The record contains much testimony bearing on the activities and habits of decedent during his later years; his forgetfulness and lapses of memory, particularly with regard to happenings of recent occurrence; his course of conduct in sexual attempts upon his livestock; his delusions with respect to the water in a neighbor's well being sour and black, poisonous and unhealthful, and about the same neighbor's barn blowing from and back to its foundation; and his delusions about his fear and feeling that certain people were continually persecuting and trying to rob him, and that a certain local doctor had inherited a large sum of money in Ohio. The delusions appeared to have no factual foundation to support them. They were apparently the creatures of a deranged mind of which the functions had become

affected by advancing years, worry over losses, and perhaps excessive use of liquor.

When the record is considered in the light of the evidence and of the cases and precedents collected and summarized in the various works on nervous and mental diseases, the conclusion is impelling that, as the trial court found, deceased was in the advanced stages of senile dementia. There is certainly evidence in the record to sustain that conclusion.

It is important to understand who is competent to make a will. Section 6974, Revised Codes, provides, in effect, that every person over the age of eighteen years and of sound mind may make a will. All that is required by this section is that a person have testamentary capacity at the time of the execution of the will. The question might well be asked just how queer a man must be in order that it may be determined that he has no testamentary capacity. It is a question, not whether a testator is sane or insane, but rather whether or not he is mentally competent. In the case of *In re Carroll's Estate,* 59 Mont. 403, 196 Pac. 996, 997, this court said on that point: ''In our opinion, the word 'incompetent,' when applied to an individual's incapacity to make a will, should be construed to apply to any person who, whether insane or not, is, by reason of immaturity, old age, disease, weakness of mind, or from any other cause, unable to understand what property he has, the relationship that he bears to those who would naturally be the objects of his bounty, and what disposition he may be making of his property at the time.'' (See, also, *In re Bielenberg's Estate,* 86 Mont. 521, 284 Pac. 546; *In re Cummings' Estate,* 92 Mont. 185, 11 Pac. (2d) 968.) Thus it may be said from this statement that what might be the considerations to be given to general insanity would take us far afield from the common-sense test and doctrine announced in the cases above cited as to what constitutes mental incompetency.

Proponents established a prima facie case from which arose the presumption that deceased was mentally competent to dispose of his property by will. It was then incumbent upon

the contestant to overcome this presumption by a preponderance of the evidence, which, in the opinion of the trial court, she did. (*In re Silver's Estate,* 98 Mont. 141, 38 Pac. (2d) 277, citing cases.)

Closely allied with the question of mental capacity of the ▇ maker of a will is the subject of unjust or unnatural wills. Generally speaking, where a will is so unnatural, unfair, or unjust on its face as to be contrary to sound public morals, fair play, and justice, such unnaturalness calls for an explanation when challenged by contest. True, this fact, standing alone, raises no presumption of incompetency, but it is a circumstance to be considered by the trier of the facts, whether judge or jury, in connection with all the other evidence. (*Murphy* v. *Nett,* 47 Mont. 38, 130 Pac. 451; *In re Williams' Estate,* 52 Mont. 192, 156 Pac. 1087, Ann. Cas. 1917E, 126; *In re Gallo's Estate,* 61 Cal. App. 163, 214 Pac. 496; *In re Martin's Estate,* 170 Cal. 657, 151 Pac. 138; 68 C. J., pp. 452, 475.) On this point it was said in *Meier* v. *Buchter,* 197 Mo. 68, 94 S. W. 883, 888, 6 L. R. A. (n. s.) 202, 7 Ann. Cas. 887: "An unnatural disposition of property, standing alone, may not avoid a will, but the result of such unhappy distribution may be tempered and toned down, possibly to avoidance, by allowing it to be weighed by the triors of fact, along with other facts tending to show undue influence or testamentary incapacity."

The general rule which is applicable to such conditions, and upon which the lower court based its decision, is formulated by 1 Schouler on Wills, fifth edition, section 77, page 91, as follows: "Notwithstanding the broad principle which maintains testamentary capacity, it is generally found in practice that a will which is partial and unjust in its provisions, absurd, or clearly devoid of natural duty or affection, finds no hearty support in the courts. Such wills are not, indeed, absolutely void; but their execution may be regarded with jealousy and suspicion. The spiritual tribunals in early times, following the Roman law of inofficious testaments, made little compunction of setting senseless wills aside, or, as Swinburne very strongly expressed

it, 'if there be but one word sounding to folly.' Foolish words, foolish phrases, cannot in these days, however, be said to invalidate any will at the Anglo-Saxon law; * * * But the English law does not follow the Roman in avoiding such wills peremptorily as the offspring of incapacity, nor even so as to prevent one absolutely from disinheriting his own offspring. On the contrary, if a testator be legally competent to make his will, and acts freely, his will cannot be impeached because harsh, unequal, unreasonable, imprudent, or unaccountable in its provisions; nor as being a foolish visionary disposition, nor even as being devoid of natural affection and moral duty. It may be that what on the face of the will appears an unnatural disposition, may be reasonably explained. And certainly the more distant or unfamiliar one's heirs and next of kin, the less should he be expected to provide for them, equally or at all, by his testament. But in order to sustain any unjust, unnatural, or absurd will, which may be contested, fair proof at least should be afforded that the testator was of sufficient capacity at the date of execution to comprehend its import; and furthermore the trier of the case should believe that neither essential mistake on his part nor the fraud nor undue influence of others about him produced so unhappy a disposition. * * * In fine, a harsh and unnatural disposition by the will in question, is a circumstance which tends to discredit the maker's testamentary capacity.''

From an examination of the provisions of the will it is obvious that the trial court had basis for its finding that it was the intention of deceased to disinherit his widow. Under the facts and circumstances disclosed by the evidence, the nature of this will clearly becomes one of the controlling considerations in passing upon deceased's testamentary capacity. The trial court was much impressed with this feature of the case, and apparently it gave it weight in arriving at its decision. Proponents explain this by saying that deceased and his wife had become estranged, and that in the last years of his life he had developed an antipathy and dislike for her. It is undisputed

that deceased in these later years had taken excessively to drinking. The record shows that on these occasions his wife cared for him; in fact, it presents to us the picture of a patient and tolerant woman. Possibly, as an outgrowth of his drinking, there were quarrels between them. The squandering of the earnings which had been the result of their mutual labors may have led contestant to much "nagging" of him in an effort to help him mend his ways. On this account he may have developed a resentment toward his wife, just as he may have done as a result of her finding him in unnatural relations with animals. The trial court was not much impressed with this explanation, nor are we.

The record does not disclose sufficient facts to enable us actually to determine the basis for the antipathy and dislike. It is hard, however, to explain it on any basis that does not really involve matters which of necessity have a bearing upon the testamentary capacity of deceased. On this point, Smoot on Insanity, p. 1, speaking of senile dementia, makes the following statement: "The person affected becomes petulant and childish, having foolish likes and dislikes. This is what is spoken of in our folklore as 'the second childhood,' and is a matter of frequent remark among very old persons. It also sometimes gives rise to a form of insanity known as insane aversion. Insane aversion consists of a condition of the mind which fosters an unreasonable and unfounded dislike for certain persons, frequently their closest kin. The question of its existence usually arises in case of contested wills, where the testator's testamentary capacity is called into question." (See, also, Maloy on Nervous and Mental Diseases, supra.)

It would extend this opinion to undue length to attempt to discuss in detail the evidence of all of the various witnesses who testified in the case. The trial court mentioned that the record was voluminous. It is indeed so. About forty witnesses gave testimony; they may be divided into three general groups, as follows: (a) Those present at the execution of the will; (b) lay witnesses who were acquaintances of the deceased; and (c)

medical witnesses. The attorney who prepared the will and the stenographer who wrote it testified positively to the mental capacity of deceased on the day the will was executed. The lay witnesses testified as to their judgment based upon observation and personal contacts. The medical witnesses, three physicians residing in Forsyth, testified that deceased was incompetent to make a will. They based their judgment upon the facts as detailed to them in a hypothetical question.

Of course, all of this testimony went to the capacity of deceased on the day he made the will. It is obvious that the only direct evidence on that subject came from those who were present at the very time of its execution; but the testimony of the other witnesses was competent and proper for consideration by the court. The rule in that respect was well stated in the case of *In re Smethurst's Estate*, 15 Cal. App. (2d) 322, 59 Pac. (2d) 830, 836, wherein the court said: "Upon the contest of a will on the ground that the deceased was of unsound mind, it is the mental condition of the testator at the very time of the execution of the will that is important. Evidence as to mental condition before or after the execution of the will is important only in so far as it tends to show the mental condition at the time of the execution of the instrument. Therefore, there being no direct evidence of incompetency at the very time of the testamentary act, it is necessary to determine whether or not the inferences to be drawn from the evidence of mental condition before and after the testamentary act are in substantial conflict with the presumption of competency and with the positive testimony of the subscribing witnesses, and other uncontradicted proof of sound mental condition at the very time in question."

With respect to the medical testimony, a very good statement is found in the case of *Stackhouse* v. *Horton*, 15 N. J. Eq. 202, 208. There the court said: "The abstract opinion of any witness, medical or of any other profession, is not of any importance. No judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinions of witnesses, however numerous or respectable. A man may be of

unsound mind, and his whole neighborhood may declare him so. But whether that unsoundness amounts to judicial incapacity for the discharge of the important duty of making a final disposal of his property, is a question which the court must determine upon its own responsibility. It does not depend upon the uncertain or fluctuating opinions of witnesses, but is to be ascertained by the court by the application of certain rules of law in the exercise of a sound discretion regulated by these rules. * * * The opinion of a witness must be brought to the test of facts, that the court may judge what estimate the opinion is entitled to. It is proper and legal to ask a witness his opinion as to the mental capacity of the individual to discharge the duty in question. * * * The court will judge of the intelligence of the witness upon the subject to which he testifies, and the proper weight to be given to his opinion from the facts and circumstances upon which he founds his opinion.''

In the case of *In re Redfield's Estate,* 116 Cal. 637, 48 Pac. 794, 799, the above statement was quoted with approval, and with the further comment: ''It was the province and duty of the jury to draw the inference of fact from the evidence before them, regulated by the rules of law stated to them by the court; being assisted but not superseded in that function by the opinions of experts.''

Many authorities were cited by counsel in their very able briefs. No two cases, however, are exactly alike. The most that can be said of these authorities is that they lay down general rules for the consideration of the subject of mental competency in matters testamentary. After all, the court, trying the case without a jury, was confronted by the necessity of making a decision. We think there is no question that there was substantial evidence tending to show lack of testamentary capacity, as well as substantial evidence tending to show the exact contrary. The court heard all of the evidence, and it was its duty to give consideration to all of the facts and circumstances of the case. This court has often said: ''The solution of any issue in a civil case may rest entirely upon circum-

stantial evidence. * * * All that is required is that the evidence shall produce moral certainty in an unprejudiced mind. * * * In other words, when it furnishes support for the plaintiff's theory of the case, and thus tends to exclude any other theory, it is sufficient to sustain a verdict or decision." (*Gilmore* v. *Ostronich,* 48 Mont. 305, 137 Pac. 378, 379; *Doney* v. *Ellison,* 103 Mont. 591, 64 Pac. (2d) 348, and cases there cited.) The court had a right to take into consideration all of the facts and circumstances, and it doubtless did so. The case might have been tried to a jury (sec. 10032, subd. 4, Rev. Codes), but it was tried to the court instead. In the case of *In re Noyes' Estate,* 40 Mont. 178, 105 Pac. 1013, 1017, this court said: "If the evidence had been submitted to a jury, either party having the right to demand a trial by jury, * * * the verdict would have been conclusive. That the findings were made by the court does not change the rule."

So we say that, although the evidence of those present at the exact time of the execution of the document was not directly contradicted, because no one else was in a position to contradict it, nevertheless all of the evidence in the case and all of the circumstances surrounding the transaction — evidence of the mental condition and acts and declarations of deceased within reasonable times before and after the date of the signing of the document—were pertinent to the issue involved. It was for the trier of facts to make the ultimate finding. It (the court) had the advantage of personal observation of the witnesses. This court has often refused to disturb a verdict or finding in a matter of this character where there was substantial evidence to support it in the record. (*In re Carroll's Estate,* supra; *In re Williams' Estate,* supra; *Murphy* v. *Nett,* supra; *In re Bielenberg's Estate,* supra; *In re Noyes' Estate,* supra.)

We think it is obvious that there was substantial evidence to support the court's finding. It is true that there was a very sharp conflict, but that fact does not alter the effect of that finding. That being the state of the record, we cannot disturb the judgment.

We have not given serious consideration to the matter of the ▮ advancement mentioned in the purported will, except in so far as it bore upon the testamentary competency of the deceased. It is, however, interesting to observe that our statutes do not specifically provide for deductions on account of advancements made to other than children and lineal descendants. We do not assume to say that such cannot be done. We merely mention the fact that such an attempt to provide deductions may some time present a rather novel question under the laws of Montana.

The judgment is affirmed.

MR. CHIEF JUSTICE SANDS, and ASSOCIATE JUSTICES ANDERSON, MORRIS and ANGSTMAN concur.