369 P.2d 526 (1962)
140 Mont. 170
In the Matter of the ESTATE of John RUDD, Deceased.
Sophie Lundervold JOHNSON, et al., Objectors, Plaintiffs and Respondents,
v.
John J. JENSEN, Mike Davey, Roman Catholic Bishop of Great Falls, a corporation sole, and Community Congregational Church of Absarokee, Montana, Petitioners, Proponents, Defendants, and Appellants.
No. 10237.
Supreme Court of Montana.
Submitted January 16, 1962.
Decided March 6, 1962.
*527 Blenkner & Blenkner, Columbus, Sandall, Moses, Cavan & Battin, Billings, Wm. R. Morse, Absarokee, Wiggenhorn, Hutton, Schiltz & Sheehy, James L. Sandall, (argued orally), John C. Sheehy, (argued orally), Billings, for appellants.
Henry I. Grant, Jr., Columbus, Coleman, Lamey & Crowley, Frank A. Gallagher, (argued orally), Billings, for respondents.
JAMES T. HARRISON Chief Justice.
On January 12, 1960, John Rudd, a Norwegian immigrant to the United States, died in Columbus, Montana, at the age of 88 years, leaving an estate in excess of $70,000. He was a single man, never having married. His known relatives were Hans Birkeland, a third cousin; Ole Lundervold, a second cousin; Sophie Lundervold Johnson, Ole's daughter; and Alvin Johnson, the son of Sophie.
On January 19, 1960, a document dated January 9, 1960, was offered for probate as the last will and testament of John Rudd. The will listed as beneficiaries three churches in Absarokee, Montana; the Congregational; the Lutheran; and the Catholic. The principal beneficiary was John F. Jensen, 29 years of age, of Columbus, Montana. The document revoked a previous will and codicil dated 1957, wherein Sophie Lundervold Johnson, Alvin Johnson, and the Lutheran Church of which John Rudd had been a member for over 40 years, were beneficiaries.
An opposition to probate of will was filed by Ole Lundervold, Sophie and Alvin Johnson. After a trial, the court sitting without a jury decreed that the will was improperly attested and executed. From this judgment appeal was taken by the proponents of the will.
The background and facts surrounding the attestation and execution of the will dated January 9, 1960, are as follows:
For approximately two years prior to the execution of the purported will, John Rudd had been in failing health. In 1957, he was hospitalized in Columbus for a period of time. He suffered from diabetes and Stokes'-Adams syndrome. About January 3, 1960, Rudd suffered a stroke which was either a cerebral hemorrhage or a thrombosis. Paralysis of the left arm and leg resulted from the stroke. In addition to his physical condition there is considerable doubt as to whether Rudd could read English.
From the time John Rudd was released from the hospital in 1957 to shortly before his death, he resided at his farm with Wayne Jensen and John F. Jensen who were brothers. On January 9, 1960, being the sixth day following his stroke and while confined to his farm house, Rudd expressed a desire to Wayne Jensen to make a new will. Wayne testified that he was instructed by Rudd to have a will prepared leaving all his property to the three churches in Absarokee, and also to procure the necessary witnesses, one of whom was to be Rudd's physician, Dr. Andrew J. Wehler. Wayne Jensen then consulted with an attorney in Columbus and was correctly advised by such counsel that unless Rudd lived for thirty days after the execution of the will, the gift to the churches would not be valid in excess of one-third of the estate. John Rudd was informed of this fact and, according to Wayne's testimony, he was instructed to have a will drawn leaving one-third of the estate to the churches, a house to Mr. Van Bell, and the remainder of the estate to John F. Jensen, Wayne's brother. Wayne again contacted *528 the attorney, a will was drawn, and he further testified he then returned to the ranch and read the will to Rudd.
Wayne then left the will with Rudd and he and his brother John went into the bedroom and conversed. The subject of the conversation was Leo Uhrich. According to Wayne, Rudd had requested him to secure the sheriff and the doctor as witnesses. The sheriff being out of town Wayne had arranged with Uhrich to come instead, and was concerned as to what Rudd would say when another person came in place of the one he had requested. When they came out of the bedroom they found that Rudd had already signed page one of the will. Wayne remonstrated that he should not sign until the witnesses came and Rudd then stated: "No, I want to go in and lay down, and it doesn't make any difference. You can be witnesses." Emphasis supplied.
Approximately one-half hour after John Rudd signed the will and while he was lying in bed in the bedroom, the witnesses, Dr. Wehler and Leo Uhrich arrived at the ranch. Uhrich had been informed by Wayne Jensen that the purpose of his visit was to witness a will, however, Dr. Wehler had only been told he was to witness a paper.
Upon arrival, Dr. Wehler went immediately to the bedroom of John Rudd and examined him, determined that he had suffered a stroke and should be placed in a hospital. Dr. Wehler asked Rudd a number of questions as he had done on previous occasions, and found his mental condition good. However, during the examination nothing was said by or to Rudd concerning his will or the real purpose of the doctor's visit. Rudd at this time was not physically able to stand or walk by himself.
While the physical examination was taking place, Leo Uhrich stood in the doorway of the bedroom part of the time and then left and sat at the kitchen table where he remained until after signing the will. He testified that he only heard parts of the conversation between Dr. Wehler and Rudd. Dr. Wehler completed the examination, returned to the kitchen, and informed Wayne Jensen that John Rudd would have to be taken to the hospital. John F. Jensen stated he would dress Rudd, whereupon he went into the bedroom. Wayne Jensen then produced the will and asked Dr. Wehler if he would witness it. Both the doctor and Wayne Jensen testified they believed John Rudd could have heard this conversation from the bedroom.
Dr. Wehler then returned to the bedroom, at which time he found Rudd sitting up in bed. Dr. Wehler stated: "Is this the way you want it, John?" John Rudd answered, "Yah".
Dr. Wehler then went to the table in the kitchen, sat down and signed the will, and then handed the document to Leo Uhrich and stated to him: "This is John's will, will you sign it?" Uhrich then signed the document. The witnesses for the proponents of the will again stated they believed John Rudd could have overheard this statement from the bedroom. However, it is noteworthy that when this statement was made, John F. Jensen, a proponent of the will, was in the bedroom dressing Rudd, which task was not easy in view of the physical condition of Rudd and even if John Rudd could have heard such statement were he listening, the process of being dressed could have been distracting, and he must have been tired because he expressed his wish to lie down and he may not have been listening. All of this, of course, is speculation on the facts and what might have been possible, but it points up the lack of proof of the attestation required by the statute.
The fact that Dr. Wehler was requested to sign the will by Wayne Jensen, his asking John Rudd if that was the way he wanted it, his signing, and the signing of Leo Uhrich constituted one continuous transaction according to the testimony in the record.
The whereabouts of John F. Jensen during this transaction is somewhat confused. The fact that Rudd was sitting up in bed when Dr. Wehler asked him if that was the way he wanted it indicates John F. *529 Jensen was in the bedroom at that time, because John F. Jensen's testimony indicates he was in the bedroom when Rudd sat up. He was definitely in the bedroom dressing Rudd when the will was witnessed by Dr. Wehler and handed to Leo Uhrich to sign with the doctor's statement: "This is John's Will".
As the bedroom door was opposite the table where the will was witnessed, a large part of the testimony was devoted to whether Rudd could have seen the witnesses signing the will. While he was being dressed, at times he stood, and at times he was seated on the bed. If he was standing at the time the witnesses signed the document, the record indicated he could probably have seen them sign. However, if he was seated on the bed, he probably could not have seen the signing. There is no evidence that he did see the witnesses sign. After he was dressed, Rudd was carried on a chair out to a car and transported to the hospital where he died three days later.
The court in its findings of fact, which are summarized below, held:
1. That testator affixed his signature to the will at least fifteen or thirty minutes before the attesting witnesses;
2. That John Rudd was in failing health and was partially paralyzed;
3. That Rudd could not see his will nor Dr. Wehler when the doctor affixed his signature to the will;
4. That John Rudd did not sign the purported will in the presence of the attesting witnesses nor acknowledge to them in any manner that the name subscribed on the document was his signature;
5. That John Rudd did not declare to the attesting witnesses that the document was his will; and
6. That John Rudd did not request the attesting witnesses to sign their names as witnesses and they did not sign in his presence.
Prior to an examination of the merits of this appeal we again reiterate the position of this court in reviewing equity appeals. In Havre Irrigation Co. v. Majerus, 132 Mont. 410, 318 P.2d 1076, we stated:
"* * * this court indulges in the presumption that the judgment of the trial court is correct, and will draw every legitimate inference therefrom to support the presumption."
Also our inquiry into the evidence is limited to whether the findings of the trial court are supportable when the evidence is viewed in the light most favorable to the prevailing party. See Barcus v. Galbreath, 122 Mont. 537, 207 P.2d 559.
Section 91-107, R.C.M. 1947, the statute specifying the requisites necessary for proper execution and attestation of a will states in part:
"1. It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto;
"2. The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority.
"3. The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; and,
"4. There must be two attesting witnesses, each of whom must sign his name as a witness, at the end of the will, at the testator's request, and in his presence."
In the case of In re Noyes' Estate, 40 Mont. 178, 186, 105 P. 1013, 1016, in speaking of the legislative requisites for execution and attestation of a will, this court stated:
"The purpose of the formalities prescribed is to prevent simulated and fraudulent writings from being probated and used as genuine. While the application of the strict rule of construction may sometimes defeat the intention of the testator as manifested by an imperfectly executed and authenticated writing, yet in the long run such statutes tend to promote justice, by *530 lessening, so far as possible, the opportunity for fraud, which history and experience have demonstrated to be feasible and measurably safe in the absence of them. * * *
"Since the right to make testamentary disposition is dependent upon the will of the Legislature, it is no hardship upon anyone that the mode and formalities by which it may be effectively done are made mandatory by the same power. This rule of interpretation is recognized and applied by the courts generally, both in England and in this country, whether the particular formality involved refers to the place of the signature of the testator, or the fact that he signed or made acknowledgment in the presence of the witnesses, or that he made publication, or that the witnesses have properly signed in his presence, and in the presence of each other and at his request. All of these formalities stand as of equal importance, and all must be observed."
It is settled in this jurisdiction that the attestation clause raises a presumption of due execution of a will. In re Connelly's Estate, 138 Mont. 153, 355 P.2d 145. However, where the oral testimony of the subscribing witness contradicts the statements in the attestation clause, the trier of facts must resolve the question as to which should prevail. Williams v. Swords, 129 Mont. 165, 284 P.2d 674.
The question presented to this court is whether under the facts stated previously there has been substantial compliance with the requirements of section 91-107, supra. This court has previously stated in effect that substantial compliance means only that a court should determine whether the statute has been followed sufficiently so as to carry out the intent for which it was adopted. The intent of the legislation being the elimination of fraud. See In re Miller's Estate, 37 Mont. 545, 97 P. 935.
Therefore, we will examine section 91-107, supra, by paragraphs.
Paragraph one requires a will to be subscribed at the end thereof by the testator. This portion of the statute has evidently been complied with as all the witnesses stated the signature at the end of the document was the signature of the deceased, John Rudd.
Paragraph two requires the subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or his authority.
It is apparent that the subscription was not made in the presence of the attesting witnesses. Therefore, the question remains as to whether it was acknowledged by the testator to the attesting witnesses.
The general rule regarding acknowledgment by the testator and his request for the witnesses to sign as subscribing witnesses is found in In re Connelly's Estate, supra, wherein this court stated:
"* * * This court has held that the right to make a will depends upon the consent of the legislature and there must be strict compliance with the statute, In re Noyes' Estate, 40 Mont. 178, 105 P. 1013, but we have also declared that substantial compliance with the statute is sufficient and where, by actions or circumstances, it is shown that the will is that of the testator and that he is requesting the witnesses to sign as subscribing witnesses the exact words are not required."
If we assume solely for the purposes of argument that the statement made by Dr. Wehler, "Is this the way you want it John?" and John's answer "Yah" was intended by John Rudd to serve as an acknowledgment of his signature, the statutory requirement of acknowledgment is still not satisfied. Section 91-107, subd. 2, supra, requires: "The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority." Emphasis supplied. The statute requires the acknowledgment to be made to all the witnesses not just one. The testimony of Leo Uhrich establishes that he did not hear *531 the exchange between Dr. Wehler and John Rudd, for he testified as follows:
"Q. Now I think you said that John Rudd never at any time asked you to sign anything out there? A. No, he did not.
"Q. And you didn't hear John Rudd say anything in connection with anybody signing a paper, did you? A. No, I didn't."
In Estate of Abbey, 183 Cal. 524, 191 P. 893, the testatrix did not sign her will in the presence of the witnesses. However, she was asked in their presence if she wanted them to sign as subscribing witnesses and she stated she did. The court in considering the question of the sufficiency of the acknowledgment stated: "The request that these persons sign the will as `subscribing witnesses' was in effect an acknowledgment of her signature to them, for only by signing the will in their presence, or by acknowledging the same in their presence, could they become subscribing witnesses." Emphasis supplied.
Therefore, as John Rudd did not verbally acknowledge his signature the question remains whether an acknowledgment may be implied from his conduct and the attending circumstances surrounding the signing.
Appellants rely on the case of Estate of Gray, 75 Cal. App.2d 386, 171 P.2d 113, wherein an acknowledgment by the testatrix was implied by her acts and the attendant circumstances. The testatrix, after receiving her will from her attorney and after her attorney had explained to her the provisions of the will in detail, called the witnesses on the phone. She explained to the witnesses that she wished them to witness her will. When the witnesses arrived, they found the testatrix seated at the coffee table with the document in front of her. She had already signed the instrument. Without saying a word she handed the witnesses a pen and they signed the will. The court in holding that the will should be admitted to probate stated:
"The actions of Mrs. Gray constituted an unequivocal acknowledgment and declaration that she was executing the document as her will. The law does not require useless formalities, and any oral declaration by her could not have expressed her intentions more unmistakably than they were expressed by her actions. The purpose of the law in requiring the maker of a will to declare it to be his will is to avoid the possibility of fraud or mistake. Considering the facts established by undisputed evidence, there was not even a remote possibility that Mrs. Gray was doing or thought she was doing anything other than to execute her will."
Contrast the situation in the Gray case with the facts present in the instant case. In the Gray case the will was explained to the testatrix by her attorney, whom she instructed to draw the will. In the instant case the will was drawn from the instructions given to an attorney by Wayne Jensen, brother of the principal beneficiary. Wayne Jensen also read the will to John Rudd.
The witnesses in the Gray case were informed by the testatrix over the telephone that she wished them to witness her will. In the instant case, the witnesses were informed by Wayne Jensen that they were to witness a will.
When the witnesses arrived at the home of Mrs. Gray they found her seated with the will in front of her. She then handed the witnesses a pen and they signed. When the witnesses in the instant case arrived at the ranch, they found Rudd in the bedroom. There were no affirmative acts by him to give the witnesses any indication that he wished them to sign his will. In addition, there is considerable doubt whether he could have seen the witnesses signing.
Can we say as in the Gray case that "there was not even a remote possibility" that John Rudd was doing or thought he was doing anything other than executing a will. We think not.
The district court in its findings of fact and conclusions of law held in effect that the requisites of section 91-107, supra, were not substantially complied with. As *532 substantial compliance means the absence of a possibility of fraud, the district court has held that a possibility of fraud existed. The district court occupied an advantageous position in being able to see the witnesses and judge their credibility.
Since we find the district court's judgment is supportable because of the failure of John Rudd to acknowledge his signature, no reason exists for determining whether the remainder of section 91-107, supra, was complied with.
The judgment is affirmed.
DOYLE, ADAIR, CASTLES and JOHN C. HARRISON, JJ., concur.